# Exhibit H

**In The Matter Of:**

*ISOMEDIA, Inc. v.*
*SPECTRUM DIRECT, INC.*

---

*HOWARD MOFSHIN*
*May 18, 2010*

---

*New Wave Depo LLC*
*4400 N. Federal Highway, Suite 210-19*
*Boca Raton, FL 33431*
*Phone (561) 368-8587 Toll Free (877) 544-WAVE*
*Fax (561) 483-2132  Toll Free (877) 944-WAVE*



Original File 5-18-10.txt
**Min-U-Script® with Word Index**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON, SEATTLE


CASE NO. C08-1733



ISOMEDIA, Inc., a Washington
corporation; ISOMEDIA.COM, LLC, a
Washington limited liability company,

      Plaintiffs,

vs.


SPECTRUM DIRECT, INC., Et AL.,

      Defendants.
_____/


TELEPHONIC DEPOSITION OF HOWARD MOFSHIN


Tuesday, May 18, 2010

12:00 p.m. to 1:20 p.m.

5100 Town Center Circle
Boca Raton, Florida



Reported By:
DEBORAH LAWRENCE, Court Reporter
Notary Public, State of Florida
New Wave Depo LLC

```
 1    APPEARANCES:

 2    On behalf of the Plaintiffs
      DOUGLAS MCKINLEY, ESQUIRE
 3    ROBERT SIEGEL, ESQUIRE
      I Justice Law PC
 4    PO Box 25817
      Seattle, Washington 98165-1317
 5

 6    On behalf of the Defendants
      DEREK LINKE, ESQUIRE
 7    Newman and Newman
      505 Fifth Avenue South, Suite 610
 8    Seattle, Washington 98104

 9
      On behalf of Prosper Inc.
10    JORDAN CAMERON, ESQUIRE
      Hill Johnson & Schmutz
11    4844 N. 300 West
      #300
12    Provo, Utah 84604

13
      On behalf of Mr. Mofshin & Green Bullion
14    CATHY LERMAN, ESQUIRE
      Green Bullion
15    2800 Gateway Drive
      Pompano Beach, Florida 33069
16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   WITNESS:          DIRECT    CROSS    REDIRECT    RECROSS

 4   HOWARD MOFSHIN

 5   BY MR. MCKINLEY      4
     BY MR. LINKE                  32
 6   BY MR. MCKINLEY                          34

 7

 8

 9

10                  E X H I B I T S

11

12

13   NUMBER                                    PAGE

     PLAINTIFF'S EXHIBIT NO. 1 FOR ID            18
14
     PLAINTIFF'S EXHIBIT NO. 2 FOR ID            20
15
     PLAINTIFF'S EXHIBIT NO. 3 FOR ID            21
16
     PLAINTIFF'S EXHIBIT NO. 4 FOR ID            23
17
     PLAINTIFF'S EXHIBIT NO. 5 FOR ID            26
18
     PLAINTIFF'S EXHIBIT NO. 6 FOR ID            28
19
     PLAINTIFF'S EXHIBIT NO. 7 FOR ID            34
20

21

22

23

24

25
```

```
 1                      PROCEEDINGS
 2           Deposition taken before DEBORAH LAWRENCE, Court
 3    Reporter and Notary Public in and for the State of Florida
 4    at Large, in the above cause.
 5    Thereupon,
 6                      (HOWARD MOFSHIN)
 7    having been duly sworn or affirmed, was examined and
 8    testified as follows:
 9                      DIRECT EXAMINATION
10    BY MR. MCKINLEY:
11        Q.   Can I ask the witness to state and spell his name
12    for the record?
13        A.   Howard Jonathan Mofshin, H-O-W-A-R-D,
14    J-O-N-A-T-H-A-N, M-O-F-S-H-I-N.
15        Q.   Howard, have you had your deposition taken before
16    in the past?
17        A.   No.
18        Q.   The way the process works is I am going to be
19    asking you a series questions and I need you to answer those
20    questions honestly.
21             Can you do that for me?
22        A.   Yes.
23        Q.   If have you trouble hearing me or don't understand
24    my question I want you to tell me that you didn't hear me or
25    you don't understand my question.  Otherwise, I am going to
```

1    assume that you did.

2              Is that okay?

3        A.    That is okay.

4        Q.    It's important that you respond verbally as

5    opposed to nodding your head or anything like that because

6    none of us can see you and the court reporter won't be able

7    to record that answer.

8              Do you understand you need to respond verbally?

9        A.    Yes.

10       Q.    Howard, did you ever work for Green Bullion?

11       A.    Yes.

12       Q.    When did you work for Green Bullion?  From what

13   period of time?

14       A.    2007 through 2009.

15       Q.    What was your job at Green Bullion?

16       A.    I was the president.

17       Q.    What duties did your job entail?

18       A.    Pretty much everything.

19       Q.    Could you describe what you mean by everything?

20       A.    From making sure that the melts went out to the

21   buyer of the gold bars to interviewing people to be hired

22   and fired.

23       Q.    Why did you leave your job at Green Bullion?

24       A.    It was just the right time and right deal for me

25   to leave at that point.

```
 1        Q.    The right deal, you left for another job?

 2        A.    I was one of the founders of the company so I had

 3   an opportunity to leave Green Bullion.

 4        Q.    Can you explain what you mean by an opportunity?

 5        A.    I had a severance package that I felt was adequate

 6   and the time that I spent there.  I felt it was adequate for

 7   me to make a move and leave.

 8        Q.    So, is it fair to say that they offered you a

 9   severance package in exchange for your leave?

10        A.    Sure.

11        Q.    Why did they do that?  Why do you think they did

12   that?

13        A.    Just internal strife.

14        Q.    What was the nature of the strife?

15        A.    Just disagreements between my partner and myself.

16        Q.    Which partner?

17        A.    Jeff Aronson.

18        Q.    What were the nature of those disagreements?

19        A.    Mainly human resource issues.

20        Q.    Can you explain to me the issues that you

21   disagreed about?

22        A.    Who we should be hiring and firing.

23        Q.    Why did you disagree?

24        A.    Because he felt one way, I felt the other.

25        Q.    Which way did he feel and which way did you feel?
```

```
 1              MR. LINKE:  Objection.  It's so vague.
 2   BY MR. MCKINLEY:
 3       Q.    Do you understand my question?
 4       A.    No.
 5       Q.    You testified that he felt one way about hiring
 6   people and you felt another way about hiring people.  Is
 7   that accurate?
 8       A.    Yes.
 9       Q.    Can you explain the difference in your feelings
10   about hiring people?
11       A.    Just different recruiters we should use, the type
12   of pedigree we should be hiring.  So on.  That's it.
13       Q.    What type of pedigree were you interested in
14   hiring?
15       A.    I was interested in hiring people that were not as
16   corporate that can understand the growth of an
17   entrepreneurial type of environment?
18       Q.    What type of people is Mr. Aronson interested in
19   hiring?
20       A.    Just much more corporate and white shoes and white
21   gloves.  Major, you know, household name type companies.
22       Q.    What was he hiring those companies for?
23              MR. LINKE:  Objection.  Misstates testimony.
24   BY MR. MCKINLEY:
25       Q.    I understood you to say that Mr. Aronson was
```

1  interested in hiring white shoes and white glove companies.

2  Is that not accurate?

3      A.    Individuals from white shoe, white glove

4  companies.

5      Q.    I see.  You were interested in hiring people from

6  what kind of companies?

7      A.    More entrepreneurial earlier stage companies that

8  had the ability to wear more hats than be tunnel-visioned in

9  one type of job responsibility.

10     Q.    What were you hiring these individuals for?

11     A.    Again, anything from human resources to back room

12 melt to people that weighed and analyzed gold contents to

13 marketing to cleaning the facility.

14     Q.    Can you walk me through Green Bullion's corporate

15 ownership structure during the time you were there?

16     A.    Well, first started out as 80/20 relationship

17 between Jeff and I.

18     Q.    Who owned 80 and who owned 20?

19     A.    Jeff Aronson owned 80, Howard Mofshin owned 20.

20     Q.    It was a stand-alone entity that was owned solely

21 by you and Jeff?

22     A.    Correct.  Then.

23     Q.    What time period was that?

24     A.    '07 when I started.

25     Q.    Did that change?

1      A.    Yes.

2      Q.    When?

3      A.    I believe it was the end of '07 or beginning of

4    '08.

5      Q.    What changed?

6      A.    General Catalyst and Highland Capital, two private

7    equity companies bought into the company.

8      Q.    How did that change the structure?

9      A.    They bought 20 percent of the company equal pro

10   rata from both Jeff and I.

11     Q.    Was there a proposed change in the future?

12     A.    Yes, Mangrove Capital out of Luxembourg bought, I

13   don't remember what they bought.  Seven percent, 15 percent.

14   I think it was six, seven percent pro rata from Jeff and I.

15     Q.    When was that?

16     A.    That was summer of '09, I believe.

17     Q.    Tell me about your commercial e-mail marketing

18   practices?  Were you responsible for commercial e-mail

19   practices at Green Bullion?

20     A.    No.

21     Q.    Who was responsible?

22     A.    The networks that we used.

23     Q.    Who was responsible for hiring those networks?

24     A.    Marketing department.

25     Q.    Who was responsible for the marketing department?

1      A.    David Knight.

2      Q.    Did you have anything to do with hiring the firms

3   who did your electronic mail marketing?

4      A.    I signed off on it as president.

5      Q.    Did you have anything to do with choosing who was

6   hired to do it?

7      A.    Sorry, I am not understanding your question.

8      Q.    Who was hired to do your commercial electronic

9   mail marketing?

10      A.    David Knight.  Excuse me, it was Scott Kaufman.

11      Q.    Who did Scott Kaufman hire to do it on your

12   behalf?

13      A.    You mean the companies?

14      Q.    Yes.

15      A.    Hydra Media, Frontline, Q Interactive.  I don't

16   remember the other ones.

17      Q.    Whose decision was it to hire those companies?

18      A.    Scott Kaufman.

19      Q.    Did Scott Kaufman have the authority to hire those

20   companies on his own?

21      A.    He had the authority to get to the finish line.

22   Then for me to sign off.

23      Q.    Is Scott Kaufman still with the company?

24      A.    No, he is not.

25      Q.    Do you know when he left?

```
 1      A.    Within the last couple of weeks, I think.  I'm not

 2   sure.  Within the last couple of weeks.

 3      Q.    Do you know why he left?

 4      A.    Take a better opportunity I think salary wise.

 5      Q.    I see.  Were you in charge of any of the policies

 6   or procedures that Scott Kaufman used when choosing to hire

 7   which company to do your commercial e-mail marketing?

 8      A.    Not directly.  I mean, I was in charge of

 9   everything but not directly that.

10      Q.    What were the policies and procedures that were to

11   be used?

12      A.    Basically that we had to use e-mail marketing,

13   banner advertising.  That the companies that got leads for

14   us only were to get leads through e-mail marketing, banner

15   advertising or paid search and that they should have about

16   35 percent ratio of people that order those leads convert to

17   packaging coming into the door.

18      Q.    Was there any requirement that those companies

19   that did commercial electronic mail marketing for you comply

20   with any laws or statutes?

21      A.    Anyone we hired was supposed to have their own

22   in-house technology to comply with any laws that should have

23   been complied with due e-mail marketing and as such from the

24   other marketing that we did.

25      Q.    What did you do to determine whether or not they
```

1   had their in-house policies to do so?

2        A.    We asked other people in the industry and at trade

3   shows.

4        Q.    Who did you ask?

5        A.    Other vendors that were in the industry.

6        Q.    What did you ask them specifically?

7        A.    Are these guys good guys.  You know.  It was more

8   about producing leads and the fact that they would have the

9   ability to make sure that the leads that they gave to us

10  were quality leads both on conversion and on compliance with

11  the law.

12       Q.    I am confused.  Were you concerned about whether

13  or not they complied with the law?

14            MR. LINKE:   Objection.  Ambiguous as to

15       concerned.

16  BY MR. MCKINLEY:

17       Q.    Do you understand what the word concerned means,

18  Howard?

19       A.    Yes.

20       Q.    Were you concerned about whether or not the people

21  you hired to send commercial e-mails for you complied with

22  the law?

23       A.    Yes.

24       Q.    Did you do anything to look into their reputation

25  for complying with the law before you hired them?

1      A.    I thought I answered that by saying we asked other

2   people in the industry if they were "good citizens of their

3   space."

4      Q.    Did you undertake any investigation online?

5      A.    Yeah, we looked online to see if there were any

6   issues.  I don't recall what we saw.  It must have been okay

7   or we wouldn't have used them.

8      Q.    Would you have perhaps done a Google search on

9   their name?

10      A.    You know what?  I don't recall.  Sorry, it was a

11   long time ago.

12      Q.    Are you familiar with Spam House?

13      A.    No.

14      Q.    Are you familiar with the Roscoe list?

15      A.    No, the only Roscoe I remember was from Dukes of

16   Hazard.

17      Q.    Are you familiar with any organization that tracks

18   spammers?

19      A.    I mean, I know they are out there.  I don't know

20   their names.

21      Q.    Did you use any of those organizations as a

22   research when you were conducting your due diligence to see

23   if the people you were hiring to send commercial e-mails

24   complied with the law?

25      A.    You know, Scott Kaufman could better answer that.

1    I would assume he did.

2        Q.    Walk me through the process that took place at

3    your company when one of the companies you hired to send

4    commercial e-mails sent out an advertising campaign?

5        A.    We would have creative either done by our in-house

6    creative department or by whichever house, for lack of a

7    better word, was sending the e-mail out to their list of

8    clients.  I guess it was or affiliate.  As long as the

9    creative met our internal rules which were it couldn't say

10   certain things or couldn't have any type of inference that

11   we were the highest paid -- we paid the highest prices.

12   Anything that wasn't exactly what our terms and conditions

13   stated.  Once that met all those objectives we would then

14   send the creative or approve the creative that was sent to

15   us from the house and they would then do what they do to get

16   leads for us.

17       Q.    Did you ever review any of the e-mails that were

18   sent out on your behalf?

19       A.    Yes.

20       Q.    Did you do that as a matter of course?

21       A.    No, I did it as a matter of, you know, spot

22   checking.

23       Q.    How often would you check the e-mails?

24       A.    Once every couple weeks.

25       Q.    What would you look for when you checked the

 1   e-mails?

 2      A.    Exactly what I just stated.

 3      Q.    Would you look at the subject line on the e-mail?

 4      A.    No.

 5      Q.    Would you look at the front line on the e-mail?

 6      A.    I would just look at the creative artistic

 7   verbiage on the actual e-mail when it was opened.

 8      Q.    Could you answer my question?  Did you look at the

 9   front line on the e-mail?

10      A.    No.

11      Q.    Did you look at any of the header information on

12   the e-mail?

13      A.    No.

14      Q.    Did you inspect any of the information --

15      A.    -- that job was supposed to be done by whoever the

16   house was sending out the e-mail.

17      Q.    Did you ever receive any complaints from anyone

18   about the e-mails that were sent on your behalf?

19      A.    Yes.

20      Q.    How often did you receive those complaints?

21      A.    I don't recall how often but we did receive

22   complaints.

23      Q.    What did you do as a result of those complaints?

24      A.    We sent it to Hydra, as an example, and said if

25   this person is not interested in sending in a package please

1    take them off the list.

2        Q.    Did anyone ever complain about compliance with the

3    law when they complained about the e-mail?

4        A.    Not that I recall.

5        Q.    Did you ever review any of the e-mails as a result

6    any of the complaint?

7        A.    Yes.

8        Q.    Did you ever review the headers of the e-mails as

9    a result any of the complaints?

10       A.    Not that I recall.

11       Q.    Did you ever look into Hydra's practice as a

12   result of any complaint?

13       A.    Yes.

14       Q.    What happened when you looked into their

15   practices?

16       A.    We saw that they were not just sending e-mails and

17   banner ads and paid search.  That they were using

18   pre-populated data and surveys and other non-contractual

19   type of leads that we asked them to get us.

20       Q.    Did you consider that behavior unethical?

21       A.    Any time someone goes above and beyond a

22   contractual agreement to me it's unethical.

23       Q.    What did you do as a result of that behavior?

24       A.    We notified them that we were not going to pay for

25   these leads or any leads going forward until they changed

```
 1   their behavior and that the conversion rate on the e-mails
 2   matched with the general rule of thumb was that about 35
 3   percent of all e-mails should convert into packages.
 4        Q.   Did the fact they were behaving in a manner that
 5   was unethical cause you any concern about whether they were
 6   complying with the law in other regards?
 7        A.   It wasn't what I was thinking about.
 8        Q.   So, the fact that they were behaving in a manner
 9   you thought was unethical didn't cause you any concern about
10   whether or not they were complying with other laws?
11        A.   It caused me concern but they had always assured
12   us that they were always compliant with the laws required
13   for e-mailing any of the other types of marketing they were
14   doing for us.
15        Q.   Had they also assured you they were not using
16   surveying and other techniques you described as unethical?
17        A.   Yes, that is why we told them we were no longer
18   interested in doing business with them at the end of the
19   December '08 and have not paid them ever since then for the
20   months after they did it for us because we told them we
21   didn't want to do business with them.
22        Q.   When did you first learn of that behavior on your
23   part?
24             MR. LINKE:  Objection.  Vague as to this
25        behavior.
```

 1   BY MR. MCKINLEY:

 2        Q.    When did you first learn of what you considered to

 3   be unethical behavior on their part?

 4        A.    Toward the end of December of '08.

 5        Q.    Can I have GB009993 marked as plaintiff's one?

 6   Howard, are you looking at what's been marked as plaintiff's

 7   number one?

 8        A.    Yes.

 9        Q.    Can you tell me what it is?

10        A.    It looks like an e-mail that I -- hold on.   Looks

11   like something I must have sent to Chris Pink saying that

12   they should not be sending this lady an e-mail anymore.

13             (Plaintiff's Exhibit No. 1 was marked for

14   identification.)

15   BY MR. MCKINLEY:

16        Q.    What's the date on that e-mail?

17        A.    The date is February '09.

18        Q.    So, my understanding is you believed these guys at

19   Hydra were acting in a way that was unethical in December of

20   '08.

21             Were you still doing business with them when this

22   was sent?

23        A.    No, what happened was we stopped paying them.

24   They agreed to send e-mails for free if we -- if their

25   conversion went back into line then we pay them.   If not, we

1    wouldn't pay them for anything.  They were just sending out

2    free stuff for us.

3        Q.   How long did they send out free stuff for you?

4        A.   From January or February '09 until we stopped

5    completely which was in April.

6        Q.   For a period of four months they were sending

7    commercial electronic mail on your behalf for no

8    compensation?

9        A.   No, that is two months from February to April.

10       Q.   Did they send commercial e-mail between December

11   '08 --

12       A.   -- and February '09.

13       Q.   From the period beginning December '08 until the

14   end of February '09 did Hydra continue to send commercial

15   electronic e-mail messages on your behalf?

16       A.   We told them we were unhappy and that we did not

17   want to pay for the stuff at some time the end of December,

18   end of January.  I don't recall the exact date.  Then for a

19   period of a couple months after that they tried to do tests

20   to make sure that it met the conversion rate and they were

21   not fraudulent bad data leads.

22       Q.   I am just asking for a yes or no?

23       A.   No.

24       Q.   From the period December '08 until the end of

25   February '09, the date of that e-mail, did they send

```
 1   e-mails, commercial electronic mail messages on behalf of
 2   Green Bullion?
 3          Did Hydra send those?
 4      A.   On behalf means to me that we were in contract to
 5   pay them for those.  So, I would say no.  If you asked if
 6   they sent them, yes.
 7      Q.   Did they invoice you for e-mails sent during that
 8   period?
 9      A.   Yes.
10      Q.   Mark exhibit two.  Howard, take a minute to review
11   what looks to be an e-mail chain there.
12      A.   Got it.
13      Q.   Howard, can you tell me what you're looking at?
14      A.   I am looking at -- looks like we caught Hydra
15   sending out some type of blast e-mail to people that were
16   not requesting it.  So, what we call these is pre-populated
17   data e-mails where it looks like it was sent as e-mail but
18   it actually was never sent as e-mail.  Then they sent us
19   confirmation saying the person requested the data but it was
20   just someone's data already populated into a lead which was
21   pre-populated data.
22          (Plaintiff's Exhibit No. 2 was marked for
23   identification.)
24   BY MR. MCKINLEY:
25      Q.   There is a line in the e-mail that says it was
```

```
 1    sent from michael@utown.com to Marion Aronson --

 2        A.    -- yes.

 3        Q.    Let me finish.  It says Tim, it appears some sort

 4    of web bot or affiliate from Hydra is spamming our request

 5    kit forms.

 6              Do you know what that means?

 7        A.    A web bot would be pre-populated data.  I guess

 8    spamming would just be sending it out in a blast version.

 9        Q.    Can you review exhibit three for me, Howard?

10        A.    I got it.

11        Q.    Can you describe what is marked as exhibit three?

12        A.    My partner is saying these guys keep giving us

13    non-converting leads and that if they are going to continue

14    to do this.  We are going to continue to not pay them and we

15    are going to look for new vendors.

16              (Plaintiff's Exhibit No. 3 was marked for

17    identification.)

18    BY MR. MCKINLEY:

19        Q.    Where does it say he is not going to pay them?

20        A.    I just know what he is saying here.  It says this

21    is really bad and in no way will you be responsible for any

22    leads from the publisher.  I will I you a report of bad

23    leads and they will be credited to your account.  To me that

24    means he is not going to pay for them.

25        Q.    My understanding is that message is from Chris
```

1   Pink?

2       A.    That is.  So, but there must have been another

3   e-mail or Chris Pink must know he's giving us fraudulent

4   leads and we are not going to pay for them.

5       Q.    Were you paying for non-fraudulent leads at that

6   time?

7       A.    No, we were not paying for any leads at that time

8   but we were in a dispute with them if we were going to.  We

9   were saying we were not going to and they were saying that

10  we were going to pay for the past monies.  We had not come

11  to a conclusion.  Our conclusion was we were not paying

12  them.  Their conclusion was they thought they were going to

13  work something out with us.

14      Q.    Can you read the message below that from Jeanette

15  to Chris?

16      A.    Yeah.

17      Q.    She says Hydra needs to control their publisher.

18  It sounds to me like she is consenting to the e-mail that is

19  being sent out and she just wants them to do a better job of

20  it.

21            Is that accurate?

22      A.    She was a lower level individual in marketing and

23  had no idea of the monetary commitments or understanding

24  between the executive level and Hydra or anyone else.

25      Q.    Why was she communicating with Chris?

1      A.    Because you think Jeff and I sat around all day

2   looking at e-mail or we had people doing it for us?

3      Q.    Did she have authority to speak for your company

4   or not.

5      A.    Yes.

6      Q.    Again, she seems to be consenting to them sending

7   e-mail as long as they do so in a way that is compliant.

8           Do you think that is a fair reading of her e-mail

9   message there?

10     A.    Yes.

11     Q.    Take a look at plaintiff's four, Howard.

12     A.    I got it.

13     Q.    Can you tell me what is -- describe what's marked

14   as plaintiff's exhibit number four?

15     A.    It looks like Chris Pink is saying to us Michael

16   is doing this well enough.  Then I had sent something to him

17   saying this needs to get removed from the e-mail list ASAP.

18   Then Pete from Yahoo is saying it doesn't sound like that is

19   happening and that someone is blowing smoke up his ass.

20           (Plaintiff's Exhibit No. 4 was marked for

21   identification.)

22   BY MR. MCKINLEY:

23     Q.    What's the date on Pete's e-mail?

24     A.    January 1, '09.

25     Q.    How quickly would you try and get someone

```
 1   un-subscribed from your list?
 2        A.    ASAP.
 3        Q.    How long did it take in this case?
 4        A.    It looks like it took a month.  You know what?
 5   The problem is that other people could be e-mailing the same
 6   guy our offer.
 7        Q.    How would that work?
 8        A.    Well, let's say Hydra had 50 affiliates e-mailing
 9   our offer.  They could be e-mailing the same guy.
10        Q.    What would happen if he un-subscribed from one of
11   those affiliates?
12             MR. LINKE:  Objection.  Calls for speculation.
13   BY MR. MCKINLEY:
14        Q.    You can answer the question, Howard, if you
15   understand it?
16        A.    I don't understand it.
17             MR. MCKINLEY:  Well, can we read back the prior
18        answer?
19             (A portion of the record was read by the
20        reporter.)
21   BY MR. MCKINLEY:
22        Q.    Howard, could you explain to us what you mean by
23   the problem in that prior answer?
24        A.    The problem is if a guy got an e-mail that had he
25   shouldn't have gotten that doesn't make me happy.
```

1      Q.    What did you mean by the other affiliates though?

2      A.    From what I understand, let's say Hydra is the

3 company that we are contracted with.  That they have other

4 people that are contracted with them that e-mails someone's

5 offer out.  So, if they have a number of people e-mailing

6 our offer I am guessing that one person's name could be on

7 several lists.

8      Q.    Why would that matter?

9      A.    Because then you would be getting e-mail --

10 getting e-mail that he asked not to get a couple weeks later

11 from a different affiliate that is on mailing the list.

12      Q.    Why wouldn't there be a coordinated effort to

13 remove him from everyone's list?

14      A.    I don't know.

15           MR. LINKE:  Objection.  Calls for speculation.

16     Calls for information beyond the knowledge.

17 BY MR. MCKINLEY:

18      Q.    Do you have an answer, Howard?

19      A.    You need to ask Hydra that.  Hydra was responsible

20 for making sure that stuff was smooth.

21      Q.    Who is Scott Kaufman?

22      A.    He is a 40 year old gentleman that worked for Cash

23 for Gold.  Weighs about 250 pounds.  Balding blonde hair.

24      Q.    What did he do for Cash for Gold?

25      A.    He was our head of e-mail marketing.

```
 1        Q.    Can we mark five?

 2              MR. LINKE:  Can we go off the record to discuss

 3        something related to your recent line of questioning?

 4        It might clarify things a little bit.

 5              MR. MCKINLEY:  Sure.

 6              (Discussion was held off the record.)

 7   BY MR. MCKINLEY:

 8        Q.    Howard, have you reviewed plaintiff's five?

 9        A.    No, I haven't got it.

10        Q.    Can you describe what's marked as plaintiff's

11   five?

12        A.    Just Scott Kaufman letting some of the people in

13   marketing know about the different e-mail vendors or houses,

14   what their strengths and weaknesses are.

15              (Plaintiff's Exhibit No. 5 was marked for

16   identification.)

17   BY MR. MCKINLEY:

18        Q.    Can I draw your attention to the one called Encore

19   Ads?

20        A.    I got it.

21        Q.    Can you read that for me?

22        A.    Their ex-Hydra guys seem to know the ins and outs

23   of the industry including the tricks and know there are some

24   shadiness at Hydra.  They focus on getting Hot Mail and

25   Yahoo e-mailed into the in box and have four partners that
```

1  they work with who are experts and one is an AOL expert.

2  There have 15 million live active e-mail addresses between

3  the data they own and the lists they manage.  All e-mails

4  are opt in and have no complaints.  Recommends that we use

5  strict sub ID policies and that we don't use Click Booth.

6  These guys seem sketchy but they may be able to produce but

7  we have to watch them like a hawk.

8       Q.   Did you hire Encore Ads?

9       A.   I don't know.

10      Q.   Do you know what he meant by the shadiness at

11 Hydra?

12      A.   Yeah, meaning that they tell you they are going to

13 get you quality leads but that should convert at 35 percent

14 but they converted five, six percent.

15      Q.   What was the date on this e-mail?

16      A.   Hold on.  September 22, '09.

17      Q.   Did you do anything in September of '09 as a

18 result of his report that Hydra was shady?

19      A.   Yes, I stopped paying them in December '08.

20      Q.   Did you pay them in September?

21      A.   I don't recall.

22      Q.   Did you pay them in October?

23      A.   This is '09; right?

24      Q.   Yes.  Did you pay them September '09?

25      A.   No.

1      Q.    Did you pay them in October '09?

2      A.    No.

3      Q.    Did you pay them in November '09?

4      A.    No.

5      Q.    Skip ahead to plaintiff's six.  Can you tell me

6   what this is?

7      A.    It's a customer balance detail.

8            (Plaintiff's Exhibit No. 6 was marked for

9   identification.)

10  BY MR. MCKINLEY:

11     Q.    Do you know what customer it's for?

12     A.    Hydra.

13     Q.    What does this document show me?

14     A.    It shows me that we stopped paying them in '08.

15     Q.    Does it show payments throughout '08?

16     A.    Yes.

17     Q.    Looks to me like you were paying these guys a lot

18  of money.  Do you agree?

19     A.    Yes.

20     Q.    So, for example, it starts on September '07

21  invoiced you for $13,320 and you paid that 15 days later.

22           Is that accurate?

23     A.    That is accurate.

24     Q.    Next invoice is for $44,000 and you paid that?

25     A.    Yes.

```
 1        Q.    They were generating a lot of revenue for you
 2   during that time period, I take it.  Is that true?
 3        A.    Yes.
 4        Q.    You were paying them quite a bit of money for
 5   generating that revenue.  Is that true?
 6        A.    Yes.
 7              MR. MCKINLEY:  Let's take 15 minutes.
 8              (Brief recess was taken.)
 9   BY MR. MCKINLEY:
10        Q.    Circle back around.  When did you first figure out
11   that Hydra was acting in a way you considered unethical?
12        A.    I would say some time in December '08.
13        Q.    For how long after December '08 did Hydra continue
14   to generate leads for Green Bullion?
15        A.    About four, five months.
16        Q.    When they generated good leads did you continue to
17   convert that into a transaction?
18        A.    Yes, I believe so.
19        Q.    So, for a period of about four months they were
20   sending out commercial e-mails.  This would be January '09
21   to April '09.
22              For a period about four months you had decided
23   their business practices were unethical because they had
24   sent spam or whatever?
25              MR. LINKE:  Objection.
```

1          THE WITNESS:  No, no, no.

2          MR. LINKE:  Mischaracterization of the witness's

3     testimony.

4          THE WITNESS:  That is not why I thought they were

5     unethical.

6  BY MR. MCKINLEY:

7     Q.    Why did you think they were unethical?

8     A.    Because their conversion rates went from 35

9  percent to five, six percent.

10    Q.    Why did they go from 35 to five, six percent?

11    A.    I don't know.  That is why I thought they were

12 unethical.

13    Q.    I also want to circle back about their sending

14 commercial e-mails.  Is there someone at Green Bullion today

15 who has knowledge of Green Bullion's commercial electronic

16 e-mail practices and procedures other than you, Howard?

17         MR. LINKE:  Objection.  Vague.  Time period?

18 BY MR. MCKINLEY:

19    Q.    During the time period that you worked there.

20 Rephrase the question.  During the time period that you

21 worked for Green Bullion was there anyone at the company who

22 had a better understanding of e-mail practices?  Repeat my

23 question, then you can answer.

24         During the period that you worked at Green Bullion

25 was there anyone at the company with a better understanding

```
 1    of your commercial e-mail practices and procedures than you?

 2         A.    Shawn Kernes.

 3         Q.    Spell that for me?

 4         A.    S-H-A-W-N, K-E-R-N-E-S.

 5         Q.    Does Shawn Kernes continue to work for Green

 6    Bullion?  Do you know?

 7         A.    Yes.

 8         Q.    He still works for Green Bullion?

 9         A.    Yes.

10         Q.    Do you know if Shawn Kernes reviews the e-mails

11    that are sent on Green Bullion's behalf?

12         A.    I don't know.

13         Q.    Do you know if Shawn Kernes reviews the header

14    information in the e-mails that are sent on Green Bullion's

15    behalf?

16         A.    I don't know.

17         Q.    Do you know if Shawn Kernes did any background

18    checks on any of your affiliates?

19         A.    Not sure.

20         Q.    Who sent e-mails on your behalf?

21         A.    Not sure.

22         Q.    Do you know if Shawn has personal knowledge of

23    whether any of the affiliates who sent commercial e-mails on

24    Green Bullion's behalf comply with any statutes or laws?

25         A.    I would believe that he would because he is our
```

```
 1    chief technology officer and would make sure that anybody
 2    that does e-mailing for us is considered compliant in those
 3    aspects.
 4         Q.   Does that mean he would know about their
 5    reputation or their actual practices?
 6         A.   Not sure.
 7         Q.   You're not sure if he would know about their
 8    reputation?
 9         A.   Not sure of either question you asked me.
10              MR. MCKINLEY:  Can we go off the record?
11              (Discussion was held off the record.)
12                        CROSS EXAMINATION
13    BY MR. LINKE:
14         Q.   Mr. Mofshin, earlier you testified that Green
15    Bullion had an employee named Scott Kaufman.  Do you recall
16    that?
17         A.   Yes, sir.
18         Q.   Were you involved in Mr. Kaufman's hiring while
19    you were at Green Bullion?
20         A.   Yes.
21         Q.   Do you know approximately when Mr. Kaufman was
22    hired?
23         A.   I don't recall but it was some time I believe in
24    '09.
25         Q.   Can you give me your best guess as to whether is
```

```
 1   was early, mid --
 2          MR. MCKINLEY:  -- objection.  Calls for
 3      speculation.
 4          MR. LINKE:  Asking for an estimate.
 5          MR. MCKINLEY:  You're asking the witness to
 6      speculate.  I object.  Calls for speculation.
 7          MR. LINKE:  He just testified he has personal
 8      knowledge as to when he was hired.
 9          MR. MCKINLEY:  He testified he doesn't remember.
10      You asked him to speculate.  Objection.  Calls for
11      speculation.
12          MR. LINKE:  I am entitled to his answer on the
13      record.
14          THE WITNESS:  I believe it was February '09.
15          MR. LINKE:  Thank you.  I am done.
16                   REDIRECT EXAMINATION
17   BY MR. MCKINLEY:
18      Q.   Howard, when did you found Green Bullion?
19      A.   Green Bullion was founded some time in late '08.
20   Cash for Gold was founded earlier.  I am not sure which one
21   you're asking for.
22      Q.   Start with Cash for Gold.  When did you found Cash
23   for Gold?
24      A.   Cash for Gold was found in April or May '07.
25      Q.   At the start of the company who was in charge of
```

1    e-mail marketing relationship?

2        A.    Jeff Aronson and myself.

3        Q.    At that time period -- during that time period

4    were you the person most knowledgeable about your policies

5    and procedures related to commercial e-mails?

6        A.    Yes.

7        Q.    How long did you remain the person most

8    knowledgeable about those policies and procedures?

9        A.    First question is yes.  Second question is for

10   about four, five months.

11       Q.    Until what date?

12       A.    I don't recall.

13           MR. MCKINLEY:  Did we get the insertion order

14       back and some other stuff copied?  Go off the record.

15           (Discussion was held off the record.)

16   BY MR. MCKINLEY:

17       Q.    Mark the five page insertion order as plaintiff's

18   seven.  Howard, are you looking at what's been marked as

19   plaintiff's seven?

20       A.    Yes.

21       Q.    Can you tell me what it is?

22       A.    Insertion order.

23           (Plaintiff's Exhibit No. 7 was marked for

24   identification.)

25   BY MR. MCKINLEY:

1      Q.    Who are the parties to the insertion order?

2      A.    Myself and Chris Pink.

3      Q.    Actually, you and Chris Pink were the ones that

4  signed it.  The party would be your company.

5      A.    Okay.  Yes.  Cash for Gold LLC and Green Bullion.

6      Q.    Is Hydra a party to this insertion order?

7      A.    Yes.

8      Q.    What day was this insertion order signed?

9      A.    It looks like either 10 or 12-28-08.  I think

10  10-28-08.

11     Q.    At that time who was the person most knowledgeable

12  about your company, about your e-mailing practices and

13  procedures?

14     A.    Michael Sheronberg (phonetic.)

15     Q.    Do you know where Michael Sheronberg works now?

16     A.    No.

17     Q.    Do you know if he still works for Cash or Gold?

18     A.    He does not.

19           MR. MCKINLEY:  That's all I have.

20           (Witness was excused.)

21            (Deposition was concluded at 1:20 p.m.)

22

23

24

25

1                          CERTIFICATE

2

3

4     STATE OF FLORIDA

5     COUNTY OF PALM BEACH

6

7        I hereby certify that I have read the

8     foregoing deposition by me, given, and that the

9     statements contained herein are true and correct

10    to the best of my knowledge and belief, with the

11    exception of any corrections or notations made on the

12    errata sheet, if one was executed.

13

14       Dated this 27th of May, 2010.

15

16

17

18

19       _____

20          HOWARD MOFSHIN

21

22

23

24

25

1                     **ERRATA SHEET**

2     **IN RE:   Isomedia v. Spectrum**

3     **DEPOSITION OF:   HOWARD MOFSHIN**

4     **TAKEN:   May 18, 2010**

5

6   **DO NOT WRITE ON TRANSCRIPT   —   ENTER CHANGES HERE**

7   **PAGE #            LINE #     CHANGE     REASON**

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18       **Please forward the original signed errata sheet to**

19  **this office so that copies may be distributed to all**

20  **parties.**

21       **Under penalty of perjury, I declare that I have**

22  **read my deposition and that it true and correct subject**

23  **to any changes in form or substance entered here.**

24  **Date:**_____

25  **SIGNATURE OF DEPONENT:**_____

```
 1                    CERTIFICATE OF OATH

 2

 3

 4   STATE OF FLORIDA

 5   COUNTY OF PALM BEACH

 6

 7

 8       I, the undersigned authority, certify that

 9   HOWARD MOFSHIN personally appeared before me and was duly

10   sworn on the 18th of May, 2010.

11

12       Witness my hand and official seal this

13   27th of May, 2010.

14

15

16

17

18

19   _____

20          DEBORAH LAWRENCE
            Notary Public, State of Florida
21          My Commission Expires: 4/2/2012
            My Commission No:  DD768644

22

23

24

25
```

1                          CERTIFICATE

2
    THE STATE OF FLORIDA
3   COUNTY OF PALM BEACH

4

5          I, DEBORAH LAWRENCE, Court Reporter and Notary
    Public in and for the State of Florida at Large, do
6   hereby certify that I was authorized to and did report
    said deposition in stenotype; and that the foregoing
7   pages are a true and correct transcription of my
    shorthand notes of said deposition.

8
           I further certify that said deposition was taken at
9   the time and place hereinabove set forth and that the
    taking of said deposition was commenced and completed
10  as hereinabove set out.

11         I further certify that I am not an attorney or
    counsel of any of the parties, nor am I a relative or
12  employee of any attorney or counsel of party connected
    with the action, nor am I financially interested in the
13  action.

14         The foregoing certification of this transcript does
    not apply to any reproduction of the same by any means
15  unless under the direct control and/or direction of the
    certifying reporter.

16
           DATED this 27th of May, 2010.

17

18

19         _____
           DEBORAH LAWRENCE, Court Reporter
20

21

22

23

24

25

```
 1    DATE:        May 27, 2010

 2


 3    HOWARD MOFSHIN
      C/o Cathy Lerman, Esq.
 4    2800 Gateway Drive
      Pompano Beach, FL 33069
 5
      IN RE:        Isomedia v. Spectrum
 6


 7
           Please take notice that on the 18th of May, 2010, you
 8    gave your deposition in the above-referred matter.  At
      that time, you did not waive signature.  It is now
 9    necessary that you sign your deposition.

10         Please call our office at the below-listed number to
      schedule an appointment between the hours of 9:00 a.m.
11    and 4:30 p.m. Monday through Friday.

12
           If you do not read and sign the deposition within a
13    reasonable time, the original, which has already been
      forwarded to the ordering attorney, may be filed with
14    the Clerk of the Court.  If you wish to waive your
      signature, sign your name in the blank at the bottom of
15    this page.

16
                                  ly yours,
17

18    _____
                 DEBORAH LAWRENCE
19               New Wave Depo LLC

20

21

22
      I do hereby waive my signature:
23

24    _____

25    HOWARD MOFSHIN
```

**$**

$13,320 (1)
  28:21
$44,000 (1)
  28:24

**0**

07 (4)
  8:24;9: 3;28:20;33:24
08 (13)
  9: 4;17:19;18: 4,20;
  19:11,13,24;27:19;
  28:14,15;29:12,13;33:19
09 (17)
  9:16;18:17;19: 4,12,
  14,25;23:24;27:16,17,
  23,24;28: 1, 3;29:20,21;
  32:24;33:14

**1**

1 (2)
  18:13;23:24
1:20 (1)
  35:21
10 (1)
  35: 9
10-28-08 (1)
  35:10
12-28-08 (1)
  35: 9
15 (4)
  9:13;27: 2;28:21;29: 7

**2**

2 (1)
  20:22
20 (3)
  8:18,19;9: 9
2007 (1)
  5:14
2009 (1)
  5:14
22 (1)
  27:16
250 (1)
  25:23

**3**

3 (1)
  21:16
35 (5)
  11:16;17: 2;27:13;
  30: 8,10

**4**

4 (1)

**23:20**
40 (1)
  25:22

**5**

5 (1)
  26:15
50 (1)
  24: 8

**6**

6 (1)
  28: 8

**7**

7 (1)
  34:23

**8**

80 (2)
  8:18,19
80/20 (1)
  8:16

**A**

ability (2)
  8: 8;12: 9
able (2)
  5: 6;27: 6
above (2)
  4: 4;16:21
account (1)
  21:23
accurate (5)
  7: 7;8: 2;22:21;28:22,
  23
acting (2)
  18:19;29:11
active (1)
  27: 2
actual (2)
  15: 7;32: 5
actually (2)
  20:18;35: 3
addresses (1)
  27: 2
adequate (2)
  6: 5, 6
ads (3)
  16:17;26:19;27: 8
advertising (3)
  11:13,15;14: 4
affiliate (3)
  14: 8;21: 4;25:11
affiliates (5)
  24: 8,11;25: 1;31:18,
  23
affirmed (1)

**4: 7**
Again (2)
  8:11;23: 6
ago (1)
  13:11
agree (1)
  28:18
agreed (1)
  18:24
agreement (1)
  16:22
ahead (1)
  28: 5
always (2)
  17:11,12
Ambiguous (1)
  12:14
analyzed (1)
  8:12
answered (1)
  13: 1
anymore (1)
  18:12
AOL (1)
  27: 1
appears (1)
  21: 3
approve (1)
  14:14
approximately (1)
  32:21
April (4)
  19: 5,9;29:21;33:24
Aronson (6)
  6:17;7:18,25;8:19;
  21: 1;34: 2
around (2)
  23: 1;29:10
artistic (1)
  15: 6
ASAP (1)
  23:17;24: 2
aspects (1)
  32: 3
ass (1)
  23:19
assume (2)
  5: 1;14: 1
assured (1)
  17:11,15
attention (1)
  26:18
authority (3)
  10:19,21;23: 3

**B**

back (6)
  8:11;18:25;24:17;
  29:10;30:13;34:14
background (1)
  31:17
bad (3)

**19:21;21:21,22**
balance (1)
  28: 7
Balding (1)
  25:23
banner (3)
  11:13,14;16:17
bars (1)
  5:21
Basically (1)
  11:12
beginning (2)
  9: 3;19:13
behalf (11)
  10:12;14:18;15:18;
  19: 7,15;20: 1, 4;31:11,
  15,20,24
behaving (2)
  17: 4, 8
behavior (6)
  16:20,23;17: 1,22,25;
  18: 3
below (1)
  22:14
best (1)
  32:25
better (6)
  11: 4;13:25;14: 7;
  22:19;30:22,25
beyond (2)
  16:21;25:16
bit (2)
  26: 4;29: 4
blast (2)
  20:15;21: 8
blonde (1)
  25:23
blowing (1)
  23:19
Booth (1)
  27: 5
bot (2)
  21: 4, 7
both (2)
  9:10;12:10
bought (4)
  9: 7, 9,12,13
box (1)
  26:25
Brief (1)
  29: 8
Bullion (18)
  5:10,12,15,23;6: 3;
  9:19;20: 2;29:14;30:14,
  21,24;31: 6, 8;32:15,19;
  33:18,19;35: 5
Bullion's (5)
  8:14;30:15;31:11,14,
  24
business (4)
  17:18,21;18:21;29:23
buyer (1)
  5:21

**C**

call (1)
  20:16
called (1)
  26:18
Calls (6)
  24:12;25:15,16;33: 2,
  6,10
campaign (1)
  14: 4
Can (27)
  4:11,21;5: 6;6: 4,20;
  7: 9,16;8:14;18: 5, 9;
  20:13;21: 9,11;22:14;
  23:13;24:14,17;26: 1, 2,
  10,18,21;28: 5;30:23;
  32:10,25;34:21
Capital (2)
  9: 6,12
case (1)
  24: 3
Cash (8)
  25:22,24;33:20,22,
  24;35: 5,17
Catalyst (1)
  9: 6
caught (1)
  20:14
cause (3)
  4: 4;17: 5, 9
caused (1)
  17:11
certain (1)
  14:10
chain (1)
  20:11
change (3)
  8:25;9: 8,11
changed (2)
  9: 5;16:25
charge (3)
  11: 5, 8;33:25
check (1)
  14:23
checked (1)
  14:25
checking (1)
  14:22
checks (1)
  31:18
chief (1)
  32: 1
choosing (2)
  10: 5;11: 6
Chris (8)
  18:11;21:25;22: 3,15,
  25;23:15;35: 2, 3
Circle (2)
  29:10;30:13
citizens (1)
  13: 2

clarify (1)
26: 4
cleaning (1)
8:13
Click (1)
27: 5
clients (1)
14: 8
coming (1)
11:17
commercial (18)
9:17,18;10: 8;11: 7,
19;12:21;13:23;14: 4;
19: 7,10,14;20: 1;29:20;
30:14,15;31: 1,23;34: 5
commitments (1)
22:23
communicating (1)
22:25
companies (13)
7:21,22;8: 1, 4, 6, 7;
9: 7;10:13,17,20;11:13,
18;14: 3
company (13)
6: 2;9: 7, 9;10:23;
11: 7;14: 3;23: 3;25: 3;
30:21,25;33:25;35: 4,12
compensation (1)
19: 8
complain (1)
16: 2
complained (1)
16: 3
complaint (2)
16: 6,12
complaints (6)
15:17,20,22,23;16: 9;
27: 4
completely (1)
19: 5
compliance (2)
12:10;16: 2
compliant (3)
17:12;23: 7;32: 2
complied (4)
11:23;12:13,21;13:24
comply (3)
11:19,22;31:24
complying (3)
12:25;17: 6,10
concern (3)
17: 5, 9,11
concerned (4)
12:12,15,17,20
concluded (1)
35:21
conclusion (3)
22:11,11,12
conditions (1)
14:12
conducting (1)
13:22
confirmation (1)

20:19
confused (1)
12:12
consenting (2)
22:18;23: 6
consider (1)
16:20
considered (3)
18: 2;29:11;32: 2
contents (1)
8:12
continue (6)
19:14;21:13,14;29:13,
16;31: 5
contract (1)
20: 4
contracted (2)
25: 3, 4
contractual (1)
16:22
control (1)
22:17
conversion (5)
12:10;17: 1;18:25;
19:20;30: 8
convert (4)
11:16;17: 3;27:13;
29:17
converted (1)
27:14
coordinated (1)
25:12
copied (1)
34:14
corporate (3)
7:16,20;8:14
couple (5)
11: 1, 2;14:24;19:19;
25:10
course (1)
14:20
Court (2)
4: 2;5: 6
creative (6)
14: 5, 6, 9,14,14;15: 6
credited (1)
21:23
CROSS (1)
32:12
customer (2)
28: 7,11

## D

data (8)
16:18;19:21;20:17,19,
20,21;21: 7;27: 3
date (7)
18:16,17;19:18,25;
23:23;27:15;34:11
David (2)
10: 1,10
day (2)

23: 1;35: 8
days (1)
28:21
deal (2)
5:24;6: 1
DEBORAH (1)
4: 2
December (10)
17:19;18: 4,19;19:10,
13,17,24;27:19;29:12,13
decided (1)
29:22
decision (1)
10:17
department (3)
9:24,25;14: 6
Deposition (3)
4: 2,15;35:21
describe (4)
5:19;21:11;23:13;
26:10
described (1)
17:16
detail (1)
28: 7
determine (1)
11:25
difference (1)
7: 9
different (3)
7:11;25:11;26:13
diligence (1)
13:22
DIRECT (1)
4: 9
directly (2)
11: 8, 9
disagree (1)
6:23
disagreed (1)
6:21
disagreements (2)
6:15,18
discuss (1)
26: 2
Discussion (3)
26: 6;32:11;34:15
dispute (1)
22: 8
document (1)
28:13
done (4)
13: 8;14: 5;15:15;
33:15
door (1)
11:17
draw (1)
26:18
due (2)
11:23;13:22
Dukes (1)
13:15
duly (1)

4: 7
during (7)
8:15;20: 7;29: 2;
30:19,20,24;34: 3
duties (1)
5:17

## E

earlier (3)
8: 7;32:14;33:20
early (1)
33: 1
effort (1)
25:12
either (3)
14: 5;32: 9;35: 9
electronic (7)
10: 3, 8;11:19;19: 7,
15;20: 1;30:15
else (1)
22:24
e-mail (43)
9:17,18;11: 7,12,14,
23;14: 7;15: 3, 5, 7, 9,12,
16;16: 3;18:10,12,16;
19:10,15,25;20:11,15,
17,18,25;22: 3;18;23: 2,
7, 8,17,23;24:24;25: 9,
10,25;26:13;27: 2,15;
30:16,22;31: 1;34: 1
e-mailed (1)
26:25
e-mailing (7)
17:13;24: 5, 8, 9;25: 5;
32: 2;35:12
e-mails (25)
12:21;13:23;14: 4,17,
23;15: 1,18;16: 5, 8,16;
17: 1, 3;18:24;20: 1, 7,
17,25: 4;27: 3;29:20;
30:14;31:10,14,20,23;
34: 5
employee (1)
32:15
Encore (2)
26:18;27: 8
end (7)
9: 3;17:18;18: 4;
19:14,17,18,24
enough (1)
23:16
entail (1)
5:17
entitled (1)
33:12
entity (1)
8:20
entrepreneurial (2)
7:17;8: 7
environment (1)
7:17
equal (1)

9: 9
equity (1)
9: 7
estimate (1)
33: 4
everyone's (1)
25:13
exact (1)
19:18
exactly (1)
14:12;15: 2
EXAMINATION (3)
4: 9;32:12;33:16
examined (1)
4: 7
example (2)
15:24;28:20
exchange (1)
6: 9
Excuse (1)
10:10
excused (1)
35:20
executive (1)
22:24
Exhibit (11)
18:13;20:10,22;21: 9,
11,16;23:14,20;26:15;
28: 8;34:23
ex-Hydra (1)
26:22
expert (1)
27: 1
experts (1)
27: 1
explain (2)
6: 4,20;7: 9;24:22

## F

facility (1)
8:13
fact (3)
12: 8;17: 4, 8
fair (2)
6: 8;23: 8
familiar (2)
13:12,14,17
February (7)
18:17;19: 4, 9,12,14,
25;33:14
feel (2)
6:25,25
feelings (1)
7: 9
felt (6)
6: 5, 6,24,24;7: 5, 6
figure (1)
29:10
finish (2)
10:21;21: 3
fired (1)
5:22

**firing (1)**
6:22
**firms (1)**
10: 2
**first (5)**
8:16;17:22;18: 2;
29:10;34: 9
**five (9)**
26: 1, 8,11;27:14;
29:15;30: 9,10;34:10,17
**Florida (1)**
4: 3
**focus (1)**
26:24
**follows (1)**
4: 8
**forms (1)**
21: 5
**forward (1)**
16:25
**found (3)**
33:18,22,24
**founded (2)**
33:19,20
**founders (1)**
6: 2
**four (8)**
19: 6;23:11,14;26:25;
29:15,19,22;34:10
**fraudulent (2)**
19:21;22: 3
**free (3)**
18:24;19: 2, 3
**front (2)**
15: 5, 9
**Frontline (1)**
10:15
**future (1)**
9:11

**G**

**gave (1)**
12: 9
**GB009993 (1)**
18: 5
**General (2)**
9: 6;17: 2
**generate (1)**
29:14
**generated (1)**
29:16
**generating (2)**
29: 1, 5
**gentleman (1)**
25:22
**giving (2)**
21:12;22: 3
**glove (2)**
8: 1, 3
**gloves (1)**
7:21
**goes (1)**

16:21
**gold (10)**
5:21;8:12;25:23,24;
33:20,22,23,24;35: 5,17
**good (3)**
12: 7;13: 2;29:16
**Google (1)**
13: 8
**Green (23)**
5:10,12,15,23;6: 3;
8:14;9:19;20: 2;29:14;
30:14,15,21,24;31: 5, 8,
11,14,24;32:14,19;
33:18,19;35: 5
**growth (1)**
7:16
**guess (3)**
14: 8;21: 7;32:25
**guessing (1)**
25: 6
**guy (3)**
24: 6, 9,24
**guys (7)**
12: 7, 7;18:18;21:12;
26:22;27: 6;28:17

**H**

**hair (1)**
25:23
**happen (1)**
24:10
**happened (2)**
16:14;18:23
**happening (1)**
23:19
**happy (1)**
24:25
**hats (1)**
8: 8
**hawk (1)**
27: 7
**Hazard (1)**
13:16
**head (2)**
5: 5;25:25
**header (2)**
15:11;31:13
**headers (1)**
16: 8
**hear (1)**
4:24
**hearing (1)**
4:23
**held (3)**
26: 6;32:11;34:15
**highest (1)**
14:11,11
**Highland (1)**
9: 6
**hire (5)**
10:11,17,19;11: 6;
27: 8

**hired (9)**
5:21;10: 6, 8;11:21;
12:21,25;14: 3;32:22;
33: 8
**hiring (16)**
6:22;7: 5, 6,10,12,14,
15,19,22;8: 1, 5,10;9:23;
10: 2;13:23;32:18
**hold (2)**
18:10;27:16
**honestly (1)**
4:20
**Hot (1)**
26:24
**House (4)**
13:12;14: 6,15;15:16
**household (1)**
7:21
**houses (1)**
26:13
**HOWARD (18)**
4: 6,13,15;5:10;8:19;
12:18;18: 6;20:10,13;
21: 9;23:11;24:14,22;
25:18;26: 8;30:16;
33:18;34:18
**H-O-W-A-R-D (1)**
4:13
**human (2)**
6:19;8:11
**Hydra (20)**
10:15;15:24;18:19;
19:14;20: 3,14;21: 4;
22:17,24;24: 8;25: 2,19,
19;26:24;27:11,18;
28:12;29:11,13;35: 6
**Hydra's (1)**
16:11

**I**

**ID (1)**
27: 5
**idea (1)**
22:23
**identification (7)**
18:14;20:23;21:17;
23:21;26:16;28: 9;34:24
**important (1)**
5: 4
**including (1)**
26:23
**individual (1)**
22:22
**Individuals (2)**
8: 3,10
**industry (4)**
12: 2, 5;13: 2;26:23
**inference (1)**
14:10
**information (4)**
15:11,14;25:16;31:14
**in-house (3)**

11:22;12: 1;14: 5
**ins (1)**
26:22
**insertion (6)**
34:13,17,22;35: 1, 6, 8
**inspect (1)**
15:14
**Interactive (1)**
10:15
**interested (7)**
7:13,15,18;8: 1, 5;
15:25;17:18
**internal (2)**
6:13;14: 9
**interviewing (1)**
5:21
**into (10)**
9: 7;11:17;12:24;
16:11,14;17: 3;18:25;
20:20;26:25;29:17
**investigation (1)**
13: 4
**invoice (2)**
20: 7;28:24
**invoiced (1)**
28:21
**involved (1)**
32:18
**issues (3)**
6:19,20;13: 6

**J**

**January (4)**
19: 4,18;23:24;29:20
**Jeanette (1)**
22:14
**Jeff (8)**
6:17;8:17,19,21;9:10,
14;23: 1;34: 2
**job (7)**
5:15,17,23;6: 1;8: 9;
15:15;22:19
**Jonathan (1)**
4:13
**J-O-N-A-T-H-A-N (1)**
4:14

**K**

**Kaufman (11)**
10:10,11,18,19,23;
11: 6;13:25;25:21;
26:12;32:15,21
**Kaufman's (1)**
32:18
**keep (1)**
21:12
**Kernes (5)**
31: 2, 5,10,13,17
**K-E-R-N-E-S (1)**
31: 4
**kind (1)**

8: 6
**kit (1)**
21: 5
**Knight (2)**
10: 1,10
**knowledge (4)**
25:16;30:15;31:22;
33: 8
**knowledgeable (3)**
34: 4, 8;35:11

**L**

**lack (1)**
14: 6
**lady (1)**
18:12
**Large (1)**
4: 4
**last (2)**
11: 1, 2
**late (1)**
33:19
**later (1)**
25:10;28:21
**law (7)**
12:11,13,22,25;13:24;
16: 3;17: 6
**LAWRENCE (1)**
4: 2
**laws (5)**
11:20,22;17:10,12;
31:24
**lead (1)**
20:20
**leads (20)**
11:13,14,16;12: 8, 9,
10;14:16;16:19,25,25;
29:21;21:13,22,23;22: 4,
5, 7;27:13;29:14,16
**learn (2)**
17:22;18: 2
**leave (5)**
5:23,25;6: 3, 7, 9
**left (3)**
6: 1;10:25;11: 3
**letting (1)**
26:12
**level (2)**
22:22,24
**line (7)**
10:21;15: 3, 5, 9;
18:25;20:25;26: 3
**LINKE (15)**
7: 1,23;12:14;17:24;
24:12;25:15;26: 2;
29:25;30: 2,17;32:13;
33: 4, 7,12,15
**list (7)**
13:14;14: 7;16: 1;
23:17;24: 1;25:11,13
**lists (2)**
25: 7;27: 3

**little (1)**
  26: 4
**live (1)**
  27: 2
**LLC (1)**
  35: 5
**long (7)**
  13:11;14: 8;19: 3;
  23: 7;24: 3;29:13;34: 7
**longer (1)**
  17:17
**look (10)**
  12:24;14:25;15: 3, 5,
  6, 8,11;16:11;21:15;
  23:11
**looked (2)**
  13: 5;16:14
**looking (5)**
  18: 6;20:13,14;23: 2;
  34:18
**Looks (9)**
  18:10,10;20:11,14,17;
  23:15;24: 4;28:17;35: 9
**lot (2)**
  28:17;29: 1
**lower (1)**
  22:22
**Luxembourg (1)**
  9:12

**M**

**mail (6)**
  10: 3, 9;11:19;19: 7;
  20: 1;26:24
**mailing (1)**
  25:11
**Mainly (1)**
  6:19
**Major (1)**
  7:21
**making (2)**
  5:20;25:20
**manage (1)**
  27: 3
**Mangrove (1)**
  9:12
**manner (2)**
  17: 4, 8
**Marion (1)**
  21: 1
**Mark (3)**
  20:10;26: 1;34:17
**marked (13)**
  18: 5, 6,13;20:22;
  21:11,16;23:13,20;
  26:10,15;28: 8;34:18,23
**marketing (17)**
  8:13;9:17,24,25;10: 3,
  9;11: 7,12,14,19,23,24;
  17:13;22:22;25:25;
  26:13;34: 1
**matched (1)**

**17: 2**
**matter (3)**
  14:20,21;25: 8
**may (2)**
  27: 6;33:24
**MCKINLEY (30)**
  4:10;7: 2,24;12:16;
  18: 1,15;20:24;21:18;
  23:22;24:13,17,21;
  25:17;26: 5, 7,17;28:10;
  29: 7, 9;30: 6,18;32:10;
  33: 2, 5, 9,17;34:13,16,
  25;35:19
**mean (8)**
  5:19;6: 4;10:13;11: 8;
  13:19;24:22;25: 1;32: 4
**meaning (1)**
  27:12
**means (4)**
  12:17;20: 4;21: 6,24
**meant (1)**
  27:10
**Media (1)**
  10:15
**melt (1)**
  8:12
**melts (1)**
  5:20
**message (3)**
  21:25;22:14;23: 9
**messages (2)**
  19:15;20: 1
**met (3)**
  14: 9,13;19:20
**Michael (3)**
  23:15;35:14,15
**michael@utowncom (1)**
  21: 1
**mid (1)**
  33: 1
**might (1)**
  26: 4
**million (1)**
  27: 2
**minute (1)**
  20:10
**minutes (1)**
  29: 7
**Mischaracterization (1)**
  30: 2
**Misstates (1)**
  7:23
**MOFSHIN (4)**
  4: 6,13;8:19;32:14
**M-O-F-S-H-I-N (1)**
  4:14
**monetary (1)**
  22:23
**money (2)**
  28:18;29: 4
**monies (1)**
  22:10
**month (1)**

**24: 4**
**months (8)**
  17:20;19: 6, 9,19;
  29:15,19,22;34:10
**more (4)**
  7:20;8: 7, 8;12: 7
**most (3)**
  34: 4, 7;35:11
**move (1)**
  6: 7
**much (2)**
  5:18;7:20
**must (4)**
  13: 6;18:11;22: 2, 3
**myself (3)**
  6:15;34: 2;35: 2

**N**

**name (4)**
  4:11;7:21;13: 9;25: 6
**named (1)**
  32:15
**names (1)**
  13:20
**nature (1)**
  6:14,18
**need (3)**
  4:19;5: 8;25:19
**needs (2)**
  22:17;23:17
**networks (2)**
  9:22,23
**new (1)**
  21:15
**Next (1)**
  28:24
**nodding (1)**
  5: 5
**non-contractual (1)**
  16:18
**non-converting (1)**
  21:13
**none (1)**
  5: 6
**non-fraudulent (1)**
  22: 5
**Notary (1)**
  4: 3
**notified (1)**
  16:24
**November (1)**
  28: 3
**number (3)**
  18: 7;23:14;25: 5

**O**

**object (1)**
  33: 6
**Objection (10)**
  7: 1,23;12:14;17:24;
  24:12;25:15;29:25;

**30:17;33: 2,10**
**objectives (1)**
  14:13
**October (2)**
  27:22;28: 1
**off (9)**
  10: 4,22;16: 1;26: 2, 6;
  32:10,11;34:14,15
**offer (4)**
  24: 6, 9;25: 5, 6
**offered (1)**
  6: 8
**officer (1)**
  32: 1
**often (5)**
  14:23;15:20,21
**old (1)**
  25:22
**Once (2)**
  14:13,24
**one (12)**
  6: 2,24;7: 5;8: 9;14: 3;
  18: 5, 7;24:10;25: 6;
  26:18;27: 1;33:20
**ones (2)**
  10:16;35: 3
**online (2)**
  13: 4, 5
**only (2)**
  11:14;13:15
**opened (1)**
  15: 7
**opportunity (3)**
  6: 3, 4;11: 4
**opposed (1)**
  5: 5
**opt (1)**
  27: 4
**order (7)**
  11:16;34:13,17,22;
  35: 1, 6, 8
**organization (1)**
  13:17
**organizations (1)**
  13:21
**Otherwise (1)**
  4:25
**out (17)**
  5:20;8:16;9:12;13:19;
  14: 4, 7,18;15:16;19: 1,
  3;20:15;21: 8;22:13,19;
  25: 5;29:10,20
**outs (1)**
  26:22
**own (3)**
  10:20;11:21;27: 3
**owned (5)**
  8:18,18,19,19,20
**ownership (1)**
  8:15

**P**

**package (3)**
  6: 5, 9;15:25
**packages (1)**
  17: 3
**packaging (1)**
  11:17
**page (1)**
  34:17
**paid (7)**
  11:15;14:11,11;16:17;
  17:19;28:21,24
**part (2)**
  17:23;18: 3
**parties (1)**
  35: 1
**partner (3)**
  6:15,16;21:12
**partners (1)**
  26:25
**party (2)**
  35: 4, 6
**past (2)**
  4:16;22:10
**pay (15)**
  16:24;18:25;19: 1,17;
  20: 5;21:14,19,24;22: 4,
  10;27:20,22,24;28: 1, 3
**paying (8)**
  18:23;22: 5, 7,11;
  27:19;28:14,17;29: 4
**payments (1)**
  28:15
**pedigree (2)**
  7:12,13
**people (19)**
  5:21;7: 6, 6,10,15,18;
  8: 5,12;11:16;12: 2,20;
  13: 2,23;20:15;23: 2;
  24: 5;25: 4, 5;26:12
**percent (11)**
  9: 9,13,13,14;11:16;
  17: 3;27:13,14;30: 9, 9,
  10
**perhaps (1)**
  13: 8
**period (16)**
  5:13;8:23;19: 6,13,19,
  24;20: 8;29: 2,19,22;
  30:17,19,20,24;34: 3, 3
**person (5)**
  15:25;20:19;34: 4, 7;
  35:11
**personal (2)**
  31:22;33: 7
**person's (1)**
  25: 6
**Pete (1)**
  23:18
**Pete's (1)**
  23:23
**phonetic (1)**
  35:14
**Pink (6)**

18:11;22: 1, 3;23:15;
  35: 2, 3
place (1)
  14: 2
plaintiff's (16)
  18: 5, 6,13;20:22;
  21:16;23:11,14,20;26: 8,
  10,15;28: 5, 8;34:17,19,
  23
please (1)
  15:25
pm (1)
  35:21
point (1)
  5:25
policies (6)
  11: 5,10;12: 1;27: 5;
  34: 4, 8
populated (1)
  20:20
portion (1)
  24:19
pounds (1)
  25:23
practice (1)
  16:11
practices (9)
  9:18,19;16:15;29:23;
  30:16,22;31: 1;32: 5;
  35:12
pre-populated (4)
  16:18;20:16,21;21: 7
president (2)
  5:16;10: 4
Pretty (1)
  5:18
prices (1)
  14:11
prior (2)
  24:17,23
private (1)
  9: 6
pro (2)
  9: 9,14
problem (3)
  24: 5,23,24
procedures (7)
  11: 6,10;30:16;31: 1;
  34: 5, 8;35:13
PROCEEDINGS (1)
  4: 1
process (2)
  4:18;14: 2
produce (1)
  27: 6
producing (1)
  12: 8
proposed (1)
  9:11
Public (1)
  4: 3
publisher (2)
  21:22;22:17

**Q**

quality (2)
  12:10;27:13
quickly (1)
  23:25
quite (1)
  29: 4

**R**

rata (2)
  9:10,14
rate (2)
  17: 1;19:20
rates (1)
  30: 8
ratio (1)
  11:16
read (4)
  22:14;24:17,19;26:21
reading (1)
  23: 8
really (1)
  21:21
recall (10)
  13: 6,10;15:21;16: 4,
  10;19:18;27:21;32:15,
  23;34:12
receive (3)
  15:17,20,21
recent (1)
  26: 3
recess (1)
  29: 8
Recommends (1)
  27: 4
record (10)
  4:12;5: 7;24:19;26: 2,
  6;32:10,11;33:13;34:14,
  15
recruiters (1)
  7:11
REDIRECT (1)
  33:16
regards (1)
  17: 6
related (2)
  26: 3;34: 5
relationship (2)
  8:16;34: 1
remain (1)
  34: 7
remember (4)
  9:13;10:16;13:15;
  33: 9
remove (1)
  25:13
removed (1)
  23:17
Repeat (1)
  30:22
Rephrase (1)
  30:20
report (2)
  21:22;27:18
Reporter (1)
  4: 3;5: 6;24:20
reputation (3)
  12:24;32: 5, 8
request (1)
  21: 4
requested (1)
  20:19
requesting (1)
  20:16
required (1)
  17:12
requirement (1)
  11:18
research (1)
  13:22
resource (1)
  6:19
resources (1)
  8:11
respond (2)
  5: 4, 8
responsibility (1)
  8: 9
responsible (6)
  9:18,21,23,25;21:21;
  25:19
result (6)
  15:23;16: 5, 9,12,23;
  27:18
revenue (2)
  29: 1, 5
review (5)
  14:17;16: 5, 8;20:10;
  21: 9
reviewed (1)
  26: 8
reviews (2)
  31:10,13
right (4)
  5:24,24;6: 1;27:23
room (1)
  8:11
Roscoe (2)
  13:14,15
rule (1)
  17: 2
rules (1)
  14: 9

**S**

salary (1)
  11: 4
same (2)
  24: 5, 9
sat (1)
  23: 1
saw (1)
  13: 6;16:16
saying (10)
  13: 1;18:11;20:19;
  21:12,20;22: 9, 9;23:15,
  17,18
Scott (10)
  10:10,11,18,19,23;
  11: 6;13:25;25:21;
  26:12;32:15
search (3)
  11:15;13: 8;16:17
Second (1)
  34: 9
seem (2)
  26:22;27: 6
seems (1)
  23: 6
send (10)
  12:21;13:23;14: 3,14;
  18:24;19: 3,10,14,25;
  20: 3
sending (12)
  14: 7;15:16,25;16:16;
  18:12;19: 1, 6;20:15;
  21: 8;23: 6;29:20;30:13
sent (20)
  14: 4,14,18;15:18,24;
  18:11,22;20: 6, 7,17,18,
  18;21: 1;22:19;23:16;
  29:24;31:11,14,20,23
September (5)
  27:16,17,20,24;28:20
series (1)
  4:19
Seven (4)
  9:13,14;34:18,19
several (1)
  25: 7
severance (2)
  6: 5, 9
shadiness (2)
  26:24;27:10
shady (1)
  27:18
Shawn (6)
  31: 2, 5,10,13,17,22
S-H-A-W-N (1)
  31: 4
Sheronberg (2)
  35:14,15
shoe (1)
  8: 3
shoes (2)
  7:20;8: 1
show (2)
  28:13,15
shows (2)
  12: 3;28:14
sign (1)
  10:22
signed (3)
  10: 4;35: 4, 8
six (5)
  13: 6;16:16
9:14;27:14;28: 5;
  30: 9,10
sketchy (1)
  27: 6
Skip (1)
  28: 5
smoke (1)
  23:19
smooth (1)
  25:20
solely (1)
  8:20
someone (4)
  16:21;23:19,25;30:14
someone's (2)
  20:20;25: 4
Sorry (2)
  10: 7;13:10
sort (1)
  21: 3
sound (1)
  23:18
sounds (1)
  22:18
space (1)
  13: 3
Spam (2)
  13:12;29:24
spammers (1)
  13:18
spamming (2)
  21: 4, 8
speak (1)
  23: 3
specifically (1)
  12: 6
speculate (2)
  33: 6,10
speculation (5)
  24:12;25:15;33: 3, 6,
  11
spell (2)
  4:11;31: 3
spent (1)
  6: 6
spot (1)
  14:21
stage (1)
  8: 7
stand-alone (1)
  8:20
Start (2)
  33:22,25
started (2)
  8:16,24
starts (1)
  28:20
State (2)
  4: 3,11
stated (2)
  14:13;15: 2
statutes (2)
  11:20;31:24

**still (4)**
10:23;18:21;31: 8;
35:17
**stopped (4)**
18:23;19: 4;27:19;
28:14
**strengths (1)**
26:14
**strict (1)**
27: 5
**strife (2)**
6:13,14
**structure (2)**
8:15;9: 8
**stuff (5)**
19: 2, 3,17;25:20;
34:14
**sub (1)**
27: 5
**subject (1)**
15: 3
**summer (1)**
9:16
**supposed (2)**
11:21;15:15
**sure (14)**
5:20;6:10;11: 2;12: 9;
19:20;25:20;26: 5;
31:19,21;32: 1, 6, 7, 9;
33:20
**surveying (1)**
17:16
**surveys (1)**
16:18
**sworn (1)**
4: 7

**T**

**techniques (1)**
17:16
**technology (2)**
11:22;32: 1
**terms (1)**
14:12
**testified (5)**
4: 8;7: 5;32:14;33: 7,
9
**testimony (2)**
7:23;30: 3
**tests (1)**
19:19
**Thereupon (1)**
4: 5
**thinking (1)**
17: 7
**though (1)**
25: 1
**thought (5)**
13: 1;17: 9;22:12;
30: 4,11
**three (2)**
21: 9,11

**throughout (1)**
28:15
**thumb (1)**
17: 2
**Tim (1)**
21: 3
**today (1)**
30:14
**told (3)**
17:17,20;19:16
**took (2)**
14: 2;24: 4
**Toward (1)**
18: 4
**tracks (1)**
13:17
**trade (1)**
12: 2
**transaction (1)**
29:17
**tricks (1)**
26:23
**tried (1)**
19:19
**trouble (1)**
4:23
**true (2)**
29: 2, 5
**try (1)**
23:25
**tunnel-visioned (1)**
8: 8
**two (3)**
9: 6;19: 9;20:10
**type (9)**
7:11,13,17,18,21;8: 9;
14:10;16:19;20:15
**types (1)**
17:13

**U**

**understood (1)**
7:25
**undertake (1)**
13: 4
**unethical (12)**
16:20,22;17: 5, 9,16;
18: 3,19;29:11,23;30: 5,
7,12
**unhappy (1)**
19:16
**un-subscribed (2)**
24: 1,10
**up (1)**
23:19
**use (5)**
7:11;11:12;13:21;
27: 4, 5
**used (4)**
9:22;11: 6,11;13: 7
**using (2)**
16:17;17:15

**V**

**vague (3)**
7: 1;17:24;30:17
**vendors (3)**
12: 5;21:15;26:13
**verbally (2)**
5: 4, 8
**verbiage (1)**
15: 7
**version (1)**
21: 8

**W**

**walk (2)**
8:14;14: 2
**wants (1)**
22:19
**watch (1)**
27: 7
**way (10)**
4:18;6:24,25,25;7: 5,
6;18:19;21:21;23: 7;
29:11
**weaknesses (1)**
26:14
**wear (1)**
8: 8
**web (2)**
21: 4, 7
**weeks (4)**
11: 1, 2;14:24;25:10
**weighed (1)**
8:12
**Weighs (1)**
25:23
**what's (6)**
18: 6,16;23:13,23;
26:10;34:18
**whichever (1)**
14: 6
**white (6)**
7:20,20;8: 1, 1, 3, 3
**Whose (1)**
10:17
**wise (1)**
11: 4
**Within (2)**
11: 1, 2
**witness (6)**
4:11;30: 1, 4;33: 5,14;
35:20
**witness's (1)**
30: 2
**word (2)**
12:17;14: 7
**work (6)**
5:10,12;22:13;24: 7;
27: 1;31: 5
**worked (4)**
25:22;30:19,21,24

**works (4)**
4:18;31: 8;35:15,17

**Y**

**Yahoo (2)**
23:18;26:25
**year (1)**
25:22

1                    UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF WASHINGTON, SEATTLE

3

4                              Case No: C08-1733

5

6    ISOMEDIA, Inc., a Washington
     Corporation; ISOMEDIA.COM, LLC, a
7    Washington limited liability company

8         Plaintiffs,

9              V
     SPECTRUM DIRECT, INC., Et Al.,
10

          Defendants,
11   _____/

12

13                   **AFFIDAVIT OF LOST EXHIBITS**

     I, Jan Correggio, Notary Public in and for the State of
14   Florida, Manager of Court Reporting Services, do hereby
     certify that the exhibits to the deposition of Howard
15   Mofshin, numbered 1 through 7, were mailed by the court
     reporter on May 27, 2010, have not been received and are
16   believed to be lost in the mail. Exhibit 7 has been
     received from Mr. Siegel and has been attached to the
17   transcript.

18   FURTHER, that said records will be forwarded to Robert
     Siegel and Derek Linke at the time they are received from
19   the U. S. Postal Service.

20
     WITNESS my hand and official seal at Boca Raton,  PALM
21   BEACH,  Florida, this June 10, 2010.

22                    _____
23                    Jan Correggio
                      Court Reporter and Notary Public
24                    State of Florida at Large
                      My Commission DD 715994
25                    Expires: September 18, 2011


**52**

# In The Matter Of:

*ISOMEDIA, Inc. v.*
*SPECTRUM DIRECT, INC.*

---

*HOWARD MOFSHIN*
*May 18, 2010*

---

*New Wave Depo LLC*
*4400 N. Federal Highway, Suite 210-19*
*Boca Raton, FL 33431*
*Phone (561) 368-8587 Toll Free (877) 544-WAVE*
*Fax (561) 483-2132  Toll Free (877) 944-WAVE*

Original File 5-18-10.txt
**Min-U-Script®**

**Page 0**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON, SEATTLE

CASE NO. C08-1733

ISOMEDIA, Inc., a Washington
corporation; ISOMEDIA.COM, LLC, a
Washington limited liability company,

    Plaintiffs,

vs.

SPECTRUM DIRECT, INC., Et AL.,

    Defendants.
_____/

TELEPHONIC DEPOSITION OF HOWARD MOFSHIN

Tuesday, May 18, 2010

12:00 p.m. to 1:20 p.m.

5100 Town Center Circle
Boca Raton, Florida

Reported By:
DEBORAH LAWRENCE, Court Reporter
Notary Public, State of Florida
New Wave Depo LLC

**Page 2**

1  APPEARANCES:

2  On behalf of the Plaintiffs
3  DOUGLAS MCKINLEY, ESQUIRE
   ROBERT SIEGEL, ESQUIRE
   I Justice Law PC
4  PO Box 25817
   Seattle, Washington 98165-1317
5

6  On behalf of the Defendants
   DEREK LINKE, ESQUIRE
7  Newman and Newman
   505 Fifth Avenue South, Suite 610
8  Seattle, Washington 98104

9
   On behalf of Prosper Inc.
10 JORDAN CAMERON, ESQUIRE
   Hill Johnson & Schmutz
11 4844 N. 300 West
   #300
12 Provo, Utah 84604

13
   On behalf of Mr. Mofshin & Green Bullion
14 CATHY LERMAN, ESQUIRE
   Green Bullion
15 2800 Gateway Drive
   Pompano Beach, Florida 33069

**Page 3**

I N D E X

WITNESS:    DIRECT    CROSS    REDIRECT    RECROSS

HOWARD MOFSHIN

BY MR. MCKINLEY    4
BY MR. LINKE               32
BY MR. MCKINLEY                            34

E X H I B I T S

| NUMBER | PAGE |
|---|---|
| PLAINTIFF'S EXHIBIT NO. 1 FOR ID | 18 |
| PLAINTIFF'S EXHIBIT NO. 2 FOR ID | 20 |
| PLAINTIFF'S EXHIBIT NO. 3 FOR ID | 21 |
| PLAINTIFF'S EXHIBIT NO. 4 FOR ID | 23 |
| PLAINTIFF'S EXHIBIT NO. 5 FOR ID | 26 |
| PLAINTIFF'S EXHIBIT NO. 6 FOR ID | 28 |
| PLAINTIFF'S EXHIBIT NO. 7 FOR ID | 34 |

**Page 4**

1    PROCEEDINGS

2    Deposition taken before DEBORAH LAWRENCE, Court

3  Reporter and Notary Public in and for the State of Florida

4  at Large, in the above cause.

5  Thereupon,

6    (HOWARD MOFSHIN)

7  having been duly sworn or affirmed, was examined and

8  testified as follows:

9    DIRECT EXAMINATION

10    BY MR. MCKINLEY:

11 Q.  Can I ask the witness to state and spell his name

12   for the record?

13 A.  Howard Jonathan Mofshin, H-O-W-A-R-D,

14   J-O-N-A-T-H-A-N, M-O-F-S-H-I-N.

15 Q.  Howard, have you had your deposition taken before

16   in the past?

17 A.  No.

18 Q.  The way the process works is I am going to be

19   asking you a series questions and I need you to answer those

20   questions honestly.

21    Can you do that for me?

22 A.  Yes.

23 Q.  If have you trouble hearing me or don't understand

24   my question I want you to tell me that you didn't hear me or

25   you don't understand my question.  Otherwise, I am going to

**Page 5**

1   assume that you did.
2      Is that okay?
3   A.   That is okay.
4   Q.   It's important that you respond verbally as
5   opposed to nodding your head or anything like that because
6   none of us can see you and the court reporter won't be able
7   to record that answer.
8      Do you understand you need to respond verbally?
9   A.   Yes.
10   Q.   Howard, did you ever work for Green Bullion?
11   A.   Yes.
12   Q.   When did you work for Green Bullion?  From what
13   period of time?
14   A.   2007 through 2009.
15   Q.   What was your job at Green Bullion?
16   A.   I was the president.
17   Q.   What duties did your job entail?
18   A.   Pretty much everything.
19   Q.   Could you describe what you mean by everything?
20   A.   From making sure that the melts went out to the
21   buyer of the gold bars to interviewing people to be hired
22   and fired.
23   Q.   Why did you leave your job at Green Bullion?
24   A.   It was just the right time and right deal for me
25   to leave at that point.

**Page 6**

1   Q.   The right deal, you left for another job?
2   A.   I was one of the founders of the company so I had
3   an opportunity to leave Green Bullion.
4   Q.   Can you explain what you mean by an opportunity?
5   A.   I had a severance package that I felt was adequate
6   and the time that I spent there.  I felt it was adequate for
7   me to make a move and leave.
8   Q.   So, is it fair to say that they offered you a
9   severance package in exchange for your leave?
10   A.   Sure.
11   Q.   Why did they do that?  Why do you think they did
12   that?
13   A.   Just internal strife.
14   Q.   What was the nature of the strife?
15   A.   Just disagreements between my partner and myself.
16   Q.   Which partner?
17   A.   Jeff Aronson.
18   Q.   What were the nature of those disagreements?
19   A.   Mainly human resource issues.
20   Q.   Can you explain to me the issues that you
21   disagreed about?
22   A.   Who we should be hiring and firing.
23   Q.   Why did you disagree?
24   A.   Because he felt one way, I felt the other.
25   Q.   Which way did he feel and which way did you feel?

**Page 7**

1      MR. LINKE: Objection.  It's so vague.
2      BY MR. MCKINLEY:
3   Q.   Do you understand my question?
4   A.   No.
5   Q.   You testified that he felt one way about hiring
6   people and you felt another way about hiring people.  Is
7   that accurate?
8   A.   Yes.
9   Q.   Can you explain the difference in your feelings
10   about hiring people?
11   A.   Just different recruiters we should use, the type
12   of pedigree we should be hiring.  So on.  That's it.
13   Q.   What type of pedigree were you interested in
14   hiring?
15   A.   I was interested in hiring people that were not as
16   corporate that can understand the growth of an
17   entrepreneurial type of environment?
18   Q.   What type of people is Mr. Aronson interested in
19   hiring?
20   A.   Just much more corporate and white shoes and white
21   gloves.  Major, you know, household name type companies.
22   Q.   What was he hiring those companies for?
23      MR. LINKE: Objection.  Misstates testimony.
24      BY MR. MCKINLEY:
25   Q.   I understood you to say that Mr. Aronson was

**Page 8**

1   interested in hiring white shoes and white glove companies.
2   Is that not accurate?
3   A.   Individuals from white shoe, white glove
4   companies.
5   Q.   I see.  You were interested in hiring people from
6   what kind of companies?
7   A.   More entrepreneurial earlier stage companies that
8   had the ability to wear more hats than be tunnel-visioned in
9   one type of job responsibility.
10   Q.   What were you hiring these individuals for?
11   A.   Again, anything from human resources to back room
12   melt to people that weighed and analyzed gold contents to
13   marketing to cleaning the facility.
14   Q.   Can you walk me through Green Bullion's corporate
15   ownership structure during the time you were there?
16   A.   Well, first started out as 80/20 relationship
17   between Jeff and I.
18   Q.   Who owned 80 and who owned 20?
19   A.   Jeff Aronson owned 80, Howard Mofshin owned 20.
20   Q.   It was a stand-alone entity that was owned solely
21   by you and Jeff?
22   A.   Correct.  Then.
23   Q.   What time period was that?
24   A.   '07 when I started.
25   Q.   Did that change?

Page 9

1  A.  Yes.
2  Q.  When?
3  A.  I believe it was the end of '07 or beginning of
4    '08.
5  Q.  What changed?
6  A.  General Catalyst and Highland Capital, two private
7    equity companies bought into the company.
8  Q.  How did that change the structure?
9  A.  They bought 20 percent of the company equal pro
10   rata from both Jeff and I.
11 Q.  Was there a proposed change in the future?
12 A.  Yes, Mangrove Capital out of Luxembourg bought, I
13   don't remember what they bought.  Seven percent, 15 percent.
14   I think it was six, seven percent pro rata from Jeff and I.
15 Q.  When was that?
16 A.  That was summer of '09, I believe.
17 Q.  Tell me about your commercial e-mail marketing
18   practices?  Were you responsible for commercial e-mail
19   practices at Green Bullion?
20 A.  No.
21 Q.  Who was responsible?
22 A.  The networks that we used.
23 Q.  Who was responsible for hiring those networks?
24 A.  Marketing department.
25 Q.  Who was responsible for the marketing department?

Page 10

1  A.  David Knight.
2  Q.  Did you have anything to do with hiring the firms
3    who did your electronic mail marketing?
4  A.  I signed off on it as president.
5  Q.  Did you have anything to do with choosing who was
6    hired to do it?
7  A.  Sorry, I am not understanding your question.
8  Q.  Who was hired to do your commercial electronic
9    mail marketing?
10 A.  David Knight.  Excuse me, it was Scott Kaufman.
11 Q.  Who did Scott Kaufman hire to do it on your
12   behalf?
13 A.  You mean the companies?
14 Q.  Yes.
15 A.  Hydra Media, Frontline, Q Interactive.  I don't
16   remember the other ones.
17 Q.  Whose decision was it to hire those companies?
18 A.  Scott Kaufman.
19 Q.  Did Scott Kaufman have the authority to hire those
20   companies on his own?
21 A.  He had the authority to get to the finish line.
22   Then for me to sign off.
23 Q.  Is Scott Kaufman still with the company?
24 A.  No, he is not.
25 Q.  Do you know when he left?

Page 11

1  A.  Within the last couple of weeks, I think.  I'm not
2    sure.  Within the last couple of weeks.
3  Q.  Do you know why he left?
4  A.  Take a better opportunity I think salary wise.
5  Q.  I see.  Were you in charge of any of the policies
6    or procedures that Scott Kaufman used when choosing to hire
7    which company to do your commercial e-mail marketing?
8  A.  Not directly.  I mean, I was in charge of
9    everything but not directly that.
10 Q.  What were the policies and procedures that were to
11   be used?
12 A.  Basically that we had to use e-mail marketing,
13   banner advertising.  That the companies that got leads for
14   us only were to get leads through e-mail marketing, banner
15   advertising or paid search and that they should have about
16   35 percent ratio of people that order those leads convert to
17   packaging coming into the door.
18 Q.  Was there any requirement that those companies
19   that did commercial electronic mail marketing for you comply
20   with any laws or statutes?
21 A.  Anyone we hired was supposed to have their own
22   in-house technology to comply with any laws that should have
23   been complied with due e-mail marketing and as such from the
24   other marketing that we did.
25 Q.  What did you do to determine whether or not they

Page 12

1    had their in-house policies to do so?
2  A.  We asked other people in the industry and at trade
3    shows.
4  Q.  Who did you ask?
5  A.  Other vendors that were in the industry.
6  Q.  What did you ask them specifically?
7  A.  Are these guys good guys.  You know.  It was more
8    about producing leads and the fact that they would have the
9    ability to make sure that the leads that they gave to us
10   were quality leads both on conversion and on compliance with
11   the law.
12 Q.  I am confused.  Were you concerned about whether
13   or not they complied with the law?
14      MR. LINKE:  Objection.  Ambiguous as to
15   concerned.
16      BY MR. MCKINLEY:
17 Q.  Do you understand what the word concerned means,
18   Howard?
19 A.  Yes.
20 Q.  Were you concerned about whether or not the people
21   you hired to send commercial e-mails for you complied with
22   the law?
23 A.  Yes.
24 Q.  Did you do anything to look into their reputation
25   for complying with the law before you hired them?

ISOMEDIA, Inc. vs. 08-cv-01733-JLR  Document 225-9  Filed 06/23/10  Page 54 of 60
SPECTRUM DIRECT, INC.

HOWARD MOFSHIN
May 18, 2010

Page 13

1 A. I thought I answered that by saying we asked other
2 people in the industry if they were "good citizens of their
3 space."
4 Q. Did you undertake any investigation online?
5 A. Yeah, we looked online to see if there were any
6 issues. I don't recall what we saw. It must have been okay
7 or we wouldn't have used them.
8 Q. Would you have perhaps done a Google search on
9 their name?
10 A. You know what? I don't recall. Sorry, it was a
11 long time ago.
12 Q. Are you familiar with Spam House?
13 A. No.
14 Q. Are you familiar with the Roscoe list?
15 A. No, the only Roscoe I remember was from Dukes of
16 Hazard.
17 Q. Are you familiar with any organization that tracks
18 spammers?
19 A. I mean, I know they are out there. I don't know
20 their names.
21 Q. Did you use any of those organizations as a
22 research when you were conducting your due diligence to see
23 if the people you were hiring to send commercial e-mails
24 complied with the law?
25 A. You know, Scott Kaufman could better answer that.

Page 14

1 I would assume he did.
2 Q. Walk me through the process that took place at
3 your company when one of the companies you hired to send
4 commercial e-mails sent out an advertising campaign?
5 A. We would have creative either done by our in-house
6 creative department or by whichever house, for lack of a
7 better word, was sending the e-mail out to their list of
8 clients. I guess it was or affiliate. As long as the
9 creative met our internal rules which were it couldn't say
10 certain things or couldn't have any type of inference that
11 we were the highest paid -- we paid the highest prices.
12 Anything that wasn't exactly what our terms and conditions
13 stated. Once that met all those objectives we would then
14 send the creative or approve the creative that was sent to
15 us from the house and they would then do what they do to get
16 leads for us.
17 Q. Did you ever review any of the e-mails that were
18 sent out on your behalf?
19 A. Yes.
20 Q. Did you do that as a matter of course?
21 A. No, I did it as a matter of, you know, spot
22 checking.
23 Q. How often would you check the e-mails?
24 A. Once every couple weeks.
25 Q. What would you look for when you checked the

Page 15

1 e-mails?
2 A. Exactly what I just stated.
3 Q. Would you look at the subject line on the e-mail?
4 A. No.
5 Q. Would you look at the front line on the e-mail?
6 A. I would just look at the creative artistic
7 verbiage on the actual e-mail when it was opened.
8 Q. Could you answer my question? Did you look at the
9 front line on the e-mail?
10 A. No.
11 Q. Did you look at any of the header information on
12 the e-mail?
13 A. No.
14 Q. Did you inspect any of the information --
15 A. -- that job was supposed to be done by whoever the
16 house was sending out the e-mail.
17 Q. Did you ever receive any complaints from anyone
18 about the e-mails that were sent on your behalf?
19 A. Yes.
20 Q. How often did you receive those complaints?
21 A. I don't recall how often but we did receive
22 complaints.
23 Q. What did you do as a result of those complaints?
24 A. We sent it to Hydra, as an example, and said if
25 this person is not interested in sending in a package please

Page 16

1 take them off the list.
2 Q. Did anyone ever complain about compliance with the
3 law when they complained about the e-mail?
4 A. Not that I recall.
5 Q. Did you ever review any of the e-mails as a result
6 any of the complaint?
7 A. Yes.
8 Q. Did you ever review the headers of the e-mails as
9 a result any of the complaints?
10 A. Not that I recall.
11 Q. Did you ever look into Hydra's practice as a
12 result of any complaint?
13 A. Yes.
14 Q. What happened when you looked into their
15 practices?
16 A. We saw that they were not just sending e-mails and
17 banner ads and paid search. That they were using
18 pre-populated data and surveys and other non-contractual
19 type of leads that we asked them to get us.
20 Q. Did you consider that behavior unethical?
21 A. Any time someone goes above and beyond a
22 contractual agreement to me it's unethical.
23 Q. What did you do as a result of that behavior?
24 A. We notified them that we were not going to pay for
25 these leads or any leads going forward until they changed

Page 17

1   their behavior and that the conversion rate on the e-mails
2   matched with the general rule of thumb was that about 35
3   percent of all e-mails should convert into packages.
4   Q.   Did the fact they were behaving in a manner that
5   was unethical cause you any concern about whether they were
6   complying with the law in other regards?
7   A.   It wasn't what I was thinking about.
8   Q.   So, the fact that they were behaving in a manner
9   you thought was unethical didn't cause you any concern about
10  whether or not they were complying with other laws?
11  A.   It caused me concern but they had always assured
12  us that they were always compliant with the laws required
13  for e-mailing any of the other types of marketing they were
14  doing for us.
15  Q.   Had they also assured you they were not using
16  surveying and other techniques you described as unethical?
17  A.   Yes, that is why we told them we were no longer
18  interested in doing business with them at the end of the
19  December '08 and have not paid them ever since then for the
20  months after they did it for us because we told them we
21  didn't want to do business with them.
22  Q.   When did you first learn of that behavior on your
23  part?
24       MR. LINKE:  Objection.  Vague as to this
25  behavior.

Page 18

1        BY MR. MCKINLEY:
2   Q.   When did you first learn of what you considered to
3   be unethical behavior on their part?
4   A.   Toward the end of December of '08.
5   Q.   Can I have GB009993 marked as plaintiff's one?
6   Howard, are you looking at what's been marked as plaintiff's
7   number one?
8   A.   Yes.
9   Q.   Can you tell me what it is?
10  A.   It looks like an e-mail that I -- hold on.  Looks
11  like something I must have sent to Chris Pink saying that
12  they should not be sending this lady an e-mail anymore.
13       (Plaintiff's Exhibit No. 1 was marked for
14  identification.)
15       BY MR. MCKINLEY:
16  Q.   What's the date on that e-mail?
17  A.   The date is February '09.
18  Q.   So, my understanding is you believed these guys at
19  Hydra were acting in a way that was unethical in December of
20  '08.
21       Were you still doing business with them when this
22  was sent?
23  A.   No, what happened was we stopped paying them.
24  They agreed to send e-mails for free if we -- if their
25  conversion went back into line then we pay them.  If not, we

Page 19

1   wouldn't pay them for anything.  They were just sending out
2   free stuff for us.
3   Q.   How long did they send out free stuff for you?
4   A.   From January or February '09 until we stopped
5   completely which was in April.
6   Q.   For a period of four months they were sending
7   commercial electronic mail on your behalf for no
8   compensation?
9   A.   No, that is two months from February to April.
10  Q.   Did they send commercial e-mail between December
11  '08 --
12  A.   -- and February '09.
13  Q.   From the period beginning December '08 until the
14  end of February '09 did Hydra continue to send commercial
15  electronic e-mail messages on your behalf?
16  A.   We told them we were unhappy and that we did not
17  want to pay for the stuff at some time the end of December,
18  end of January.  I don't recall the exact date.  Then for a
19  period of a couple months after that they tried to do tests
20  to make sure that it met the conversion rate and they were
21  not fraudulent bad data leads.
22  Q.   I am just asking for a yes or no?
23  A.   No.
24  Q.   From the period December '08 until the end of
25  February '09, the date of that e-mail, did they send

Page 20

1   e-mails, commercial electronic mail messages on behalf of
2   Green Bullion?
3        Did Hydra send those?
4   A.   On behalf means to me that we were in contract to
5   pay them for those.  So, I would say no.  If you asked if
6   they sent them, yes.
7   Q.   Did they invoice you for e-mails sent during that
8   period?
9   A.   Yes.
10  Q.   Mark exhibit two.  Howard, take a minute to review
11  what looks to be an e-mail chain there.
12  A.   Got it.
13  Q.   Howard, can you tell me what you're looking at?
14  A.   I am looking at -- looks like we caught Hydra
15  sending out some type of blast e-mail to people that were
16  not requesting it.  So, what we call these is pre-populated
17  data e-mails where it looks like it was sent as e-mail but
18  it actually was never sent as e-mail.  Then they sent us
19  confirmation saying the person requested the data but it was
20  just someone's data already populated into a lead which was
21  pre-populated data.
22       (Plaintiff's Exhibit No. 2 was marked for
23  identification.)
24       BY MR. MCKINLEY:
25  Q.   There is a line in the e-mail that says it was

**Page 21**

1    sent from michael@utown.com to Marion Aronson --
2  A.  -- yes.
3  Q.  Let me finish.  It says Tim, it appears some sort
4  of web bot or affiliate from Hydra is spamming our request
5  kit forms.
6       Do you know what that means?
7  A.  A web bot would be pre-populated data.  I guess
8  spamming would just be sending it out in a blast version.
9  Q.  Can you review exhibit three for me, Howard?
10 A.  I got it.
11 Q.  Can you describe what is marked as exhibit three?
12 A.  My partner is saying these guys keep giving us
13 non-converting leads and that if they are going to continue
14 to do this.  We are going to continue to not pay them and we
15 are going to look for new vendors.
16      (Plaintiff's Exhibit No. 3 was marked for
17 identification.)
18      BY MR. MCKINLEY:
19 Q.  Where does it say he is not going to pay them?
20 A.  I just know what he is saying here.  It says this
21 is really bad and in no way will you be responsible for any
22 leads from the publisher.  I will I you a report of bad
23 leads and they will be credited to your account.  To me that
24 means he is not going to pay for them.
25 Q.  My understanding is that message is from Chris

**Page 22**

1  Pink?
2  A.  That is.  So, but there must have been another
3  e-mail or Chris Pink must know he's giving us fraudulent
4  leads and we are not going to pay for them.
5  Q.  Were you paying for non-fraudulent leads at that
6  time?
7  A.  No, we were not paying for any leads at that time
8  but we were in a dispute with them if we were going to.  We
9  were saying we were not going to and they were saying that
10 we were going to pay for the past monies.  We had not come
11 to a conclusion.  Our conclusion was we were not paying
12 them.  Their conclusion was they thought they were going to
13 work something out with us.
14 Q.  Can you read the message below that from Jeanette
15 to Chris?
16 A.  Yeah.
17 Q.  She says Hydra needs to control their publisher.
18 It sounds to me like she is consenting to the e-mail that is
19 being sent out and she just wants them to do a better job of
20 it.
21      Is that accurate?
22 A.  She was a lower level individual in marketing and
23 had no idea of the monetary commitments or understanding
24 between the executive level and Hydra or anyone else.
25 Q.  Why was she communicating with Chris?

**Page 23**

1  A.  Because you think Jeff and I sat around all day
2  looking at e-mail or we had people doing it for us?
3  Q.  Did she have authority to speak for your company
4  or not.
5  A.  Yes.
6  Q.  Again, she seems to be consenting to them sending
7  e-mail as long as they do so in a way that is compliant.
8       Do you think that is a fair reading of her e-mail
9  message there?
10 A.  Yes.
11 Q.  Take a look at plaintiff's four, Howard.
12 A.  I got it.
13 Q.  Can you tell me what is -- describe what's marked
14 as plaintiff's exhibit number four?
15 A.  It looks like Chris Pink is saying to us Michael
16 is doing this well enough.  Then I had sent something to him
17 saying this needs to get removed from the e-mail list ASAP.
18 Then Pete from Yahoo is saying it doesn't sound like that is
19 happening and that someone is blowing smoke up his ass.
20      (Plaintiff's Exhibit No. 4 was marked for
21 identification.)
22      BY MR. MCKINLEY:
23 Q.  What's the date on Pete's e-mail?
24 A.  January 1, '09.
25 Q.  How quickly would you try and get someone

**Page 24**

1  un-subscribed from your list?
2  A.  ASAP.
3  Q.  How long did it take in this case?
4  A.  It looks like it took a month.  You know what?
5  The problem is that other people could be e-mailing the same
6  guy our offer.
7  Q.  How would that work?
8  A.  Well, let's say Hydra had 50 affiliates e-mailing
9  our offer.  They could be e-mailing the same guy.
10 Q.  What would happen if he un-subscribed from one of
11 those affiliates?
12      MR. LINKE:  Objection.  Calls for speculation.
13      BY MR. MCKINLEY:
14 Q.  You can answer the question, Howard, if you
15 understand it?
16 A.  I don't understand it.
17      MR. MCKINLEY:  Well, can we read back the prior
18 answer?
19      (A portion of the record was read by the
20 reporter.)
21      BY MR. MCKINLEY:
22 Q.  Howard, could you explain to us what you mean by
23 the problem in that prior answer?
24 A.  The problem is if a guy got an e-mail that had he
25 shouldn't have gotten that doesn't make me happy.

Page 25

1 Q. What did you mean by the other affiliates though?
2 A. From what I understand, let's say Hydra is the
3 company that we are contracted with. That they have other
4 people that are contracted with them that e-mails someone's
5 offer out. So, if they have a number of people e-mailing
6 our offer I am guessing that one person's name could be on
7 several lists.
8 Q. Why would that matter?
9 A. Because then you would be getting e-mail --
10 getting e-mail that he asked not to get a couple weeks later
11 from a different affiliate that is on mailing the list.
12 Q. Why wouldn't there be a coordinated effort to
13 remove him from everyone's list?
14 A. I don't know.
15     MR. LINKE: Objection. Calls for speculation.
16 Calls for information beyond the knowledge.
17     BY MR. MCKINLEY:
18 Q. Do you have an answer, Howard?
19 A. You need to ask Hydra that. Hydra was responsible
20 for making sure that stuff was smooth.
21 Q. Who is Scott Kaufman?
22 A. He is a 40 year old gentleman that worked for Cash
23 for Gold. Weighs about 250 pounds. Balding blonde hair.
24 Q. What did he do for Cash for Gold?
25 A. He was our head of e-mail marketing.

Page 26

1 Q. Can we mark five?
2     MR. LINKE: Can we go off the record to discuss
3 something related to your recent line of questioning?
4 It might clarify things a little bit.
5     MR. MCKINLEY: Sure.
6     (Discussion was held off the record.)
7     BY MR. MCKINLEY:
8 Q. Howard, have you reviewed plaintiff's five?
9 A. No, I haven't got it.
10 Q. Can you describe what's marked as plaintiff's
11 five?
12 A. Just Scott Kaufman letting some of the people in
13 marketing know about the different e-mail vendors or houses,
14 what their strengths and weaknesses are.
15     (Plaintiff's Exhibit No. 5 was marked for
16 identification.)
17     BY MR. MCKINLEY:
18 Q. Can I draw your attention to the one called Encore
19 Ads?
20 A. I got it.
21 Q. Can you read that for me?
22 A. Their ex-Hydra guys seem to know the ins and outs
23 of the industry including the tricks and know there are some
24 shadiness at Hydra. They focus on getting Hot Mail and
25 Yahoo e-mailed into the in box and have four partners that

Page 27

1 they work with who are experts and one is an AOL expert.
2 There have 15 million live active e-mail addresses between
3 the data they own and the lists they manage. All e-mails
4 are opt in and have no complaints. Recommends that we use
5 strict sub ID policies and that we don't use Click Booth.
6 These guys seem sketchy but they may be able to produce but
7 we have to watch them like a hawk.
8 Q. Did you hire Encore Ads?
9 A. I don't know.
10 Q. Do you know what he meant by the shadiness at
11 Hydra?
12 A. Yeah, meaning that they tell you they are going to
13 get you quality leads but that should convert at 35 percent
14 but they converted five, six percent.
15 Q. What was the date on this e-mail?
16 A. Hold on. September 22, '09.
17 Q. Did you do anything in September of '09 as a
18 result of his report that Hydra was shady?
19 A. Yes, I stopped paying them in December '08.
20 Q. Did you pay them in September?
21 A. I don't recall.
22 Q. Did you pay them in October?
23 A. This is '09; right?
24 Q. Yes. Did you pay them September '09?
25 A. No.

Page 28

1 Q. Did you pay them in October '09?
2 A. No.
3 Q. Did you pay them in November '09?
4 A. No.
5 Q. Skip ahead to plaintiff's six. Can you tell me
6 what this is?
7 A. It's a customer balance detail.
8     (Plaintiff's Exhibit No. 6 was marked for
9 identification.)
10     BY MR. MCKINLEY:
11 Q. Do you know what customer it's for?
12 A. Hydra.
13 Q. What does this document show me?
14 A. It shows me that we stopped paying them in '08.
15 Q. Does it show payments throughout '08?
16 A. Yes.
17 Q. Looks to me like you were paying these guys a lot
18 of money. Do you agree?
19 A. Yes.
20 Q. So, for example, it starts on September '07
21 invoiced you for $13,320 and you paid that 15 days later.
22     Is that accurate?
23 A. That is accurate.
24 Q. Next invoice is for $44,000 and you paid that?
25 A. Yes.

| Page 29 |
| --- |

1 Q. They were generating a lot of revenue for you
2 during that time period, I take it. Is that true?
3 A. Yes.
4 Q. You were paying them quite a bit of money for
5 generating that revenue. Is that true?
6 A. Yes.
7     MR. MCKINLEY: Let's take 15 minutes.
8     (Brief recess was taken.)
9     BY MR. MCKINLEY:
10 Q. Circle back around. When did you first figure out
11 that Hydra was acting in a way you considered unethical?
12 A. I would say some time in December '08.
13 Q. For how long after December '08 did Hydra continue
14 to generate leads for Green Bullion?
15 A. About four, five months.
16 Q. When they generated good leads did you continue to
17 convert that into a transaction?
18 A. Yes, I believe so.
19 Q. So, for a period of about four months they were
20 sending out commercial e-mails. This would be January '09
21 to April '09.
22     For a period about four months you had decided
23 their business practices were unethical because they had
24 sent spam or whatever?
25     MR. LINKE: Objection.

| Page 30 |
| --- |

1     THE WITNESS: No, no, no.
2     MR. LINKE: Mischaracterization of the witness's
3 testimony.
4     THE WITNESS: That is not why I thought they were
5 unethical.
6     BY MR. MCKINLEY:
7 Q. Why did you think they were unethical?
8 A. Because their conversion rates went from 35
9 percent to five, six percent.
10 Q. Why did they go from 35 to five, six percent?
11 A. I don't know. That is why I thought they were
12 unethical.
13 Q. I also want to circle back about their sending
14 commercial e-mails. Is there someone at Green Bullion today
15 who has knowledge of Green Bullion's commercial electronic
16 e-mail practices and procedures other than you, Howard?
17     MR. LINKE: Objection. Vague. Time period?
18     BY MR. MCKINLEY:
19 Q. During the time period that you worked there.
20 Rephrase the question. During the time period that you
21 worked for Green Bullion was there anyone at the company who
22 had a better understanding of e-mail practices? Repeat my
23 question, then you can answer.
24     During the period that you worked at Green Bullion
25 was there anyone at the company with a better understanding

| Page 31 |
| --- |

1 of your commercial e-mail practices and procedures than you?
2 A. Shawn Kernes.
3 Q. Spell that for me?
4 A. S-H-A-W-N, K-E-R-N-E-S.
5 Q. Does Shawn Kernes continue to work for Green
6 Bullion? Do you know?
7 A. Yes.
8 Q. He still works for Green Bullion?
9 A. Yes.
10 Q. Do you know if Shawn Kernes reviews the e-mails
11 that are sent on Green Bullion's behalf?
12 A. I don't know.
13 Q. Do you know if Shawn Kernes reviews the header
14 information in the e-mails that are sent on Green Bullion's
15 behalf?
16 A. I don't know.
17 Q. Do you know if Shawn Kernes did any background
18 checks on any of your affiliates?
19 A. Not sure.
20 Q. Who sent e-mails on your behalf?
21 A. Not sure.
22 Q. Do you know if Shawn has personal knowledge of
23 whether any of the affiliates who sent commercial e-mails on
24 Green Bullion's behalf comply with any statutes or laws?
25 A. I would believe that he would because he is our

| Page 32 |
| --- |

1 chief technology officer and would make sure that anybody
2 that does e-mailing for us is considered compliant in those
3 aspects.
4 Q. Does that mean he would know about their
5 reputation or their actual practices?
6 A. Not sure.
7 Q. You're not sure if he would know about their
8 reputation?
9 A. Not sure of either question you asked me.
10     MR. MCKINLEY: Can we go off the record?
11     (Discussion was held off the record.)
12     CROSS EXAMINATION
13     BY MR. LINKE:
14 Q. Mr. Mofshin, earlier you testified that Green
15 Bullion had an employee named Scott Kaufman. Do you recall
16 that?
17 A. Yes, sir.
18 Q. Were you involved in Mr. Kaufman's hiring while
19 you were at Green Bullion?
20 A. Yes.
21 Q. Do you know approximately when Mr. Kaufman was
22 hired?
23 A. I don't recall but it was some time I believe in
24 '09.
25 Q. Can you give me your best guess as to whether is

Page 33

1  was early, mid --
2  　　MR. MCKINLEY: -- objection. Calls for
3  speculation.
4  　　MR. LINKE: Asking for an estimate.
5  　　MR. MCKINLEY: You're asking the witness to
6  speculate. I object. Calls for speculation.
7  　　MR. LINKE: He just testified he has personal
8  knowledge as to when he was hired.
9  　　MR. MCKINLEY: He testified he doesn't remember.
10  You asked him to speculate. Objection. Calls for
11  speculation.
12  　　MR. LINKE: I am entitled to his answer on the
13  record.
14  　　THE WITNESS: I believe it was February '09.
15  　　MR. LINKE: Thank you. I am done.
16  　　REDIRECT EXAMINATION
17  　　BY MR. MCKINLEY:
18  Q.  Howard, when did you found Green Bullion?
19  A.  Green Bullion was founded some time in late '08.
20  　Cash for Gold was founded earlier. I am not sure which one
21  　you're asking for.
22  Q.  Start with Cash for Gold. When did you found Cash
23  　for Gold?
24  A.  Cash for Gold was found in April or May '07.
25  Q.  At the start of the company who was in charge of

Page 35

1  Q.  Who are the parties to the insertion order?
2  A.  Myself and Chris Pink.
3  Q.  Actually, you and Chris Pink were the ones that
4  　signed it. The party would be your company.
5  A.  Okay. Yes. Cash for Gold LLC and Green Bullion.
6  Q.  Is Hydra a party to this insertion order?
7  A.  Yes.
8  Q.  What day was this insertion order signed?
9  A.  It looks like either 10 or 12-28-08. I think
10  　10-28-08.
11  Q.  At that time who was the person most knowledgeable
12  　about your company, about your e-mailing practices and
13  　procedures?
14  A.  Michael Sheronberg (phonetic.)
15  Q.  Do you know where Michael Sheronberg works now?
16  A.  No.
17  Q.  Do you know if he still works for Cash or Gold?
18  A.  He does not.
19  　　MR. MCKINLEY: That's all I have.
20  　　(Witness was excused.)
21  　　(Deposition was concluded at 1:20 p.m.)
22
23
24
25

Page 34

1  e-mail marketing relationship?
2  A.  Jeff Aronson and myself.
3  Q.  At that time period -- during that time period
4  　were you the person most knowledgeable about your policies
5  　and procedures related to commercial e-mails?
6  A.  Yes.
7  Q.  How long did you remain the person most
8  　knowledgeable about those policies and procedures?
9  A.  First question is yes. Second question is for
10  　about four, five months.
11  Q.  Until what date?
12  A.  I don't recall.
13  　　MR. MCKINLEY: Did we get the insertion order
14  　back and some other stuff copied? Go off the record.
15  　　(Discussion was held off the record.)
16  　　BY MR. MCKINLEY:
17  Q.  Mark the five page insertion order as plaintiff's
18  　seven. Howard, are you looking at what's been marked as
19  　plaintiff's seven?
20  A.  Yes.
21  Q.  Can you tell me what it is?
22  A.  Insertion order.
23  　　(Plaintiff's Exhibit No. 7 was marked for
24  　identification.)
25  　　BY MR. MCKINLEY:

Page 36

1  　　　　　　CERTIFICATE
2
3
4  　　STATE OF FLORIDA
5  　　COUNTY OF PALM BEACH
6
7  　　　I hereby certify that I have read the
8  　foregoing deposition by me, given, and that the
9  　statements contained herein are true and correct
10  　to the best of my knowledge and belief, with the
11  　exception of any corrections or notations made on the
12  　errata sheet, if one was executed.
13
14  　　　Dated this 27th of May, 2010.
15
16
17
18
19  　　　_____
20  　　　HOWARD MOFSHIN
21
22
23
24
25

Page 37

```
 1              ERRATA SHEET

 2    IN RE:  Isomedia v. Spectrum

 3    DEPOSITION OF:  HOWARD MOFSHIN

 4    TAKEN:  May 18, 2010

 5

 6  DO NOT WRITE ON TRANSCRIPT   -   ENTER CHANGES HERE

 7  PAGE #          LINE #        CHANGE       REASON

 8  _____

 9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18      Please forward the original signed errata sheet to

19  this office so that copies may be distributed to all

20  parties.

21      Under penalty of perjury, I declare that I have

22  read my deposition and that it true and correct subject

23  to any changes in form or substance entered here.

24  Date:_____

25  SIGNATURE OF DEPONENT:_____
```

Page 39

```
 1                  CERTIFICATE

 2
    THE STATE OF FLORIDA
 3  COUNTY OF PALM BEACH

 4

 5      I, DEBORAH LAWRENCE, Court Reporter and Notary
    Public in and for the State of Florida at Large, do
 6  hereby certify that I was authorized to and did report
    said deposition in stenotype; and that the foregoing
 7  pages are a true and correct transcription of my
    shorthand notes of said deposition.

 8
        I further certify that said deposition was taken at
 9  the time and place hereinabove set forth and that the
    taking of said deposition was commenced and completed
10  as hereinabove set out.

11      I further certify that I am not an attorney or
    counsel of any of the parties, nor am I a relative or
12  employee of any attorney or counsel of party connected
    with the action, nor am I financially interested in the
13  action.

14      The foregoing certification of this transcript does
    not apply to any reproduction of the same by any means
15  unless under the direct control and/or direction of the
    certifying reporter.

16      DATED this 27th of May, 2010.

17

18

19                  _____
                    DEBORAH LAWRENCE, Court Reporter
20

21

22

23

24

25
```

Page 38

```
 1              CERTIFICATE OF OATH

 2

 3

 4  STATE OF FLORIDA

 5  COUNTY OF PALM BEACH

 6

 7

 8      I, the undersigned authority, certify that

 9  HOWARD MOFSHIN personally appeared before me and was duly

10  sworn on the 18th of May, 2010.

11

12      Witness my hand and official seal this

13  27th of May, 2010.

14

15

16

17

18

19        _____

20        DEBORAH LAWRENCE
          Notary Public, State of Florida
21        My Commission Expires: 4/2/2012
          My Commission No:  DD768644
22

23

24

25
```

Page 40

```
 1  DATE:      May 27, 2010

 2

 3  HOWARD MOFSHIN
    C/o Cathy Lerman, Esq.
 4  2800 Gateway Drive
    Pompano Beach, FL  33069
 5
    IN RE:      Isomedia v. Spectrum
 6

 7

 8      Please take notice that on the 18th of May, 2010, you
    gave your deposition in the above-referred matter.  At
 9  that time, you did not waive signature.  It is now
    necessary that you sign your deposition.

10      Please call our office at the below-listed number to
    schedule an appointment between the hours of 9:00 a.m.
11  and 4:30 p.m. Monday through Friday.

12      If you do not read and sign the deposition within a
    reasonable time, the original, which has already been
13  forwarded to the ordering attorney, may be filed with
    the Clerk of the Court.  If you wish to waive your
14  signature, sign your name in the blank at the bottom of
    this page.
15

16      Very truly yours,

17

18      _____
        DEBORAH LAWRENCE
19      New Wave Depo LLC

20

21

22
    I do hereby waive my signature:
23

24      _____

25  HOWARD MOFSHIN
```

60